UNIVERSITIES RESEARCH ASSN., INC. *v.* COUTU

No. 78–1945.  Argued November 10, 1980—Decided April 6, 1981

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Robert E. Mann* argued the cause and filed briefs for petitioner.

*Robert Jay Nye* argued the cause for respondent. With him on the brief were *Hugh B. Arnold* and *Daniel N. Kadjan.*

*Harriet S. Shapiro* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General McCree, Assistant Attorney General Daniel,*

*Deputy Solicitor General Geller, Robert E. Kopp,* and *Eloise E. Davies.* *

JUSTICE BLACKMUN delivered the opinion of the Court.

The Davis-Bacon Act requires that certain federal construction contracts contain a stipulation that laborers and mechanics will be paid not less than prevailing wages, as determined by the Secretary of Labor. The question presented in this case is whether the Act confers upon an employee a private right of action for back wages under a contract that has been administratively determined *not* to call for Davis-Bacon work, and that therefore does not contain a prevailing wage stipulation.

I

Section 1 (a) of the Davis-Bacon Act of March 3, 1931 (Act), ch. 411, § 1, 46 Stat. 1494, as amended, 40 U. S. C. § 276a (a),[1] provides that the advertised specifications for

---

*J. *Albert Woll, Laurence Gold, Laurence J. Cohen,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

[1] Section 1 (a) reads:

"(a) The advertised specifications for every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction, alteration, and/or repair, including painting and decorating, of public buildings or public works of the United States or the District of Columbia within the geographical limits of the States of the Union, or the District of Columbia, and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed, or in the District of Columbia if the work is to be performed there; and every contract based upon these specifications shall contain a stipulation that the contractor or his subcontractor shall pay all mechanics and laborers employed directly upon the

every federal contract in excess of $2,000 "for construction, alteration, and/or repair . . . of public buildings or public works of the United States . . . shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing" for corresponding classes of laborers and mechanics employed on similar projects in the locality. Every contract based upon these specifications must contain a stipulation that the contractor shall pay wages not less than those stated in the specifications.[2]

A contract entered into pursuant to the Act must also provide that if the contractor fails to pay the minimum wages specified in the contract, the Government contracting officer may withhold so much of the accrued payments as may be considered necessary to pay the laborers and mechanics the difference between the contract wages and those actually paid. Section 3 of the Act, as added Aug. 30, 1935, 49 Stat.

---

site of the work, unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and such laborers and mechanics, and that the scale of wages to be paid shall be posted by the contractor in a prominent and easily accessible place at the site of the work; and the further stipulation that there may be withheld from the contractor so much of accrued payments as may be considered necessary by the contracting officer to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by such laborers and mechanics and not refunded to the contractor, subcontractors, or their agents."

[2] The Act also applies to contracts entered into without advertising for proposals, if the Act would be otherwise applicable. Act of Mar. 23, 1941, 55 Stat. 53; Act of Aug. 21, 1941, 55 Stat. 664, 40 U. S. C. § 276a–7.

1012, 40 U. S. C. § 276a–2,[3] authorizes the Comptroller General to pay these accrued payments directly to the laborers and mechanics.

Should the withheld funds prove insufficient to reimburse the employees, § 3 confers on them "the right of action and/or of intervention against the contractor and his sureties conferred by law upon persons furnishing labor or materials." Laborers and mechanics working under a contract that *contains* Davis-Bacon Act stipulations thus may themselves bring suit against the contractor on the payment bond that the Miller Act of August 24, 1935, 49 Stat. 793, as amended, 40 U. S. C. § 270a *et seq.* (1976 ed. and Supp. III), requires for the protection of persons supplying labor or materials under certain federal construction contracts.[4] In addition,

---

[3] Section 3 provides:

"(a) The Comptroller General of the United States is hereby authorized and directed to pay directly to laborers and mechanics from any accrued payments withheld under the terms of the contract any wages found to be due laborers and mechanics pursuant to this Act; and the Comptroller General of the United States is further authorized and is directed to distribute a list to all departments of the Government giving the names of persons or firms whom he has found to have disregarded their obligations to employees and subcontractors. No contract shall be awarded to the persons or firms appearing on this list or to any firm, corporation, partnership, or association in which such persons or firms have an interest until three years have elapsed from the date of publication of the list containing the names of such persons or firms.

"(b) If the accrued payments withheld under the terms of the contract, as aforesaid are insufficient to reimburse all the laborers and mechanics, with respect to whom there has been a failure to pay the wages required pursuant to this Act, such laborers and mechanics shall have the right of action and/or of intervention against the contractor and his sureties conferred by law upon persons furnishing labor or materials, and in such proceedings it shall be no defense that such laborers and mechanics accepted or agreed to accept less than the required rate of wages or voluntarily made refunds."

[4] Under § 1 (a)(2) of the Miller Act, 40 U. S. C. § 270a (a)(2), as it read at the time of the institution of the present suit, any person entering

if the contractor fails to pay at least the stipulated minimum wages, the contract may be terminated and the contractor debarred from all Government contracts for a period of three years.[5]

Pursuant to Reorganization Plan No. 14 of 1950, 5 U. S. C. App., p. 746, the Secretary of Labor (Secretary) has issued regulations designed to "assure coordination of administration and consistency of enforcement" of the Act and some 60 related statutes.[6]  See 29 CFR Parts 1, 3, 5, 7 (1980).[7]  In

---

into a contract exceeding $2,000 for the "construction, alteration, or repair of any public building or public work of the United States" must furnish, inter alia, a payment bond for the protection of persons supplying labor or material.  Under § 2 (a) of that Act, 40 U. S. C. § 270b (a), suits on such a bond may be brought by any person who has furnished labor or material in the performance of the contract and has not been paid in full within 90 days.

By Pub. L. 95–585, 92 Stat. 2484, approved Nov. 2, 1978, the $2,000 figure was raised to $25,000.

[5] Section 2 of the Act, as added Aug. 30, 1935, 49 Stat. 1012, 40 U. S. C. § 276a–1, provides that every contract within the scope of the Act must stipulate that the Government may terminate the contractor's right to proceed with the work in the event that it is found by the contracting officer that any laborer or mechanic "has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid."  Section 3 (a), see n. 3, supra, contains the disqualification provision.

[6] The Reorganization Plan requires the Secretary to "prescribe appropriate standards, regulations, and procedures" to be observed by contracting agencies, and directs the Secretary to make "such investigations, concerning compliance with and enforcement of such labor standards, as he deems desirable."  The Presidential message accompanying the plan made clear, however, that the contracting agency retains the primary responsibility for investigating violations and enforcing the Act.  5 U. S. C. App., p. 746.  See 29 CFR § 5.6 (1980); Elisburg, Wage Protection Under the Davis-Bacon Act, 28 Lab. L. J. 323, 326–327 (1977).

The Secretary derives further authority from the Copeland Anti-Kickback Act, ch. 482, § 2, 48 Stat. 948, as amended, 40 U. S. C. § 276c, which requires him to make reasonable regulations for federal construction contractors, including a provision that each contractor shall furnish weekly

their turn, various contracting agencies have issued detailed regulations concerning the applicability of the Act to the contracts they let. See, *e. g.*, 41 CFR Subpart 9–18.7 (1979) (Department of Energy). The contracting agency has the initial responsibility for determining whether a particular contract is subject to the Davis-Bacon Act. See A. Thieblot, The Davis-Bacon Act 31 (Labor Relations and Public Policy Series Report No. 10, Univ. of Pa., 1975) (hereinafter Thieblot). If the agency determines that the contract is subject to the Act, it must determine the appropriate prevailing wage rate,[8] and ensure that the rate chosen is inserted in the requests for bids on the project, as well as in any resulting contract. See 29 CFR § 5.5 (1980); Thieblot, at 31–34.

The contracting agency's coverage and classification determinations are subject to administrative review. Prior to the award of a contract, a contractor, labor organization, or employee may appeal a final agency determination that a project is not covered by the Act to the Department of Labor.

---

a statement of the wages paid each employee during the preceding week. In addition, § 10 of the Portal-to-Portal Act of 1947, 61 Stat. 89, 29 U. S. C. § 259, provides that an employer shall not be liable for failure to pay wages required by the Davis-Bacon Act if he proves good-faith reliance on "any written administrative regulation, order, ruling, approval, or interpretation" of the Secretary.

[7] Part 1 of 29 CFR sets forth procedures for predetermining the prevailing wage rate. Part 3, issued pursuant to the Copeland Anti-Kickback Act, requires submission of weekly payroll data. Part 5 provides guidelines for application and enforcement of the Act, including certain coverage definitions. 29 CFR § 5.2 (1980). Finally, procedures governing practice before the Department of Labor's Wage Appeals Board are set forth in Part 7.

[8] The contracting agency determines the appropriate wage rate either by referring to the "area" wage determinations published by the Secretary in the Federal Register or, if no such determinations exist for the relevant area or class of work, by requesting a project wage determination from the Wage and Hour Division of the Department of Labor. See 29 CFR §§ 1.5, 1.6 (1980); Thieblot, at 31–34.

29 CFR §§ 5.12 and 7.9 (1980).[9]  Disputes over the proper classification of workers under a contract containing Davis-Bacon provisions must be referred to the Secretary for determination.  41 CFR § 1–18.703–1 (i) (1979); 29 CFR § 5.12 (1980).  See *North Georgia Bldg. & C. T. C.* v. *U. S. Dept. of Transp.*, 399 F. Supp. 58 (ND Ga. 1975).  In turn, any "interested person" may appeal the Secretary's wage rate determination to the Wage Appeals Board of the Department of Labor, provided review is sought prior to the award of the contract at issue.  29 CFR § 1.16 (1980); 29 CFR Part 7 (1980).  See Thieblot, at 40–43.[10]

---

[9] The binding effect of the Department's coverage determination on the contracting agency is disputed.  Compare, *e. g.*, 41 Op. Atty. Gen. 488 (1960) (Secretary has final authority to determine whether employees are "laborers or mechanics" under Act and related statute), with 40 Comp. Gen. 565 (1961) (judgment of contracting officer that Act not applicable cannot be reversed by the Secretary).  Cf. 43 Op. Atty. Gen. No. 14 (1979) (Secretary has final authority to determine whether particular contracts are covered by Walsh-Healey or Service Contract Acts).

There is currently no administrative procedure that expressly provides review of a coverage determination after the contract has been let.  See 40 Comp. Gen., at 570–571 (omission of minimum wage stipulations cannot be cured after contract awarded); *North Georgia Bldg. & C. T. C.* v. *U. S. Dept. of Transp.*, 399 F. Supp. 58, 62 (ND Ga. 1975).  Proposed Department of Labor regulations, however, provide for the postaward incorporation of wage determinations in contracts that do not originally include them.  44 Fed. Reg. 77029 (Dec. 28, 1979) (proposed 29 CFR § 1.6 (f)).  The United States, as *amicus curiae*, states that several contracting agencies, including the Department of Energy, have objected to the proposed regulations, asserting that contracting agencies have final authority with respect to coverage determinations for a particular contract.

[10] The correctness of the Secretary's wage rate determination is not subject to judicial review  See, *e. g.*, *United States* v. *Binghamton Constr. Co.*, 347 U. S. 171, 177 (1954).  At least two Courts of Appeals have held, however, that the practices and procedures of the Secretary are reviewable under the standards of the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.*  See *Virginia ex rel. Commissioner, Dept. of Transp.* v. *Marshall*, 599 F. 2d 588, 592 (CA4 1979); *North Georgia Bldg. & Constr. Trades Council* v. *Goldschmidt*, 621 F. 2d 697, 707–708 (CA5

## II

Petitioner Universities Research Association, Inc., is a not-for-profit consortium of North American universities. In 1967, petitioner made a contract with the Atomic Energy Commission (AEC) to provide scientific and management services to the United States in connection with the construction, alteration, and repair of the Fermi National Accelerator Laboratory, a high-energy physics research facility located in Kane and Du Page Counties, Ill. Effective April 1972, this contract was modified to provide that petitioner also would furnish personnel to administer and operate the Fermi Laboratory. The contract was later assumed in turn by the AEC's successors, the Energy Research and Development Agency (ERDA) and the Department of Energy (DOE).[11]

At all relevant times the funding for the Fermi Laboratory was supplied entirely by the United States through the AEC. The contract, which tracked AEC procurement regulations,[12] specified the rates of compensation to be paid certain classifications of employees; in addition, petitioner was required to obtain approval from the AEC prior to adopting new classifications of employees or making any changes in employee compensation.

Article XXXIII of the contract expressly stated that it was not contemplated that petitioner would use its own employees to perform work that the AEC determined to be subject to the Act; such work, if any, was to be procured by subcontracts approved by the AEC and containing Davis-

---

1980). Cf. *Fry Bros. Corp.* v. *HUD,* 614 F. 2d 732, 733 (CA10 1980). We express no view on the latter question.

[11] See Energy Reorganization Act of 1974, 88 Stat. 1233, 42 U. S. C. § 5801 *et seq.;* Department of Energy Organization Act, 91 Stat. 565, 42 U. S. C. § 7101 *et seq.* (1976 ed., Supp. III). For convenience, we refer to the contracting agency here as the AEC.

[12] DOE procurement regulations are currently set forth in 41 CFR, ch. 9 (1979).

Bacon stipulations.[13]   In a letter dated January 23, 1968, from the AEC to petitioner, the AEC stated that Art. XXXIII was included in the contract with the understanding that the contract would be modified to incorporate Davis-Bacon stipulations "[i]f presently unforeseen conditions" arose making it necessary that Davis-Bacon work be performed by petitioner with its own employees.[14]   Another letter, dated April 6, 1972, with identical provisions was sent to petitioner by the AEC following the modification of the contract in 1972. App. 63.   In order to implement Art. XXXIII, a committee of AEC officials was designated to review specific work projects and to make Davis-Bacon Act coverage determinations as was necessary.[15]

---

[13] Article XXXIII of the contract provided:

"1. This contract does not contemplate the performance of work by the Association [petitioner], with its own employees, which the Commission [AEC] determines is subject to the Davis-Bacon Act.  Such work, if any, performed under this contract shall be procured by subcontracts which shall be subject to the written approval of the Commission and contain the provisions relative to labor and wages required by law to be included in contracts for the construction, alteration, and/or repair, including painting and decorating, of a public building or public work."   App. 55.

[14] The letter stated that Art. XXXIII was included in the contract "with the following understandings":

"(a) If presently unforeseen conditions arise which make it necessary in the best interests of timely and efficient completion of the accelerator that work be performed by the Association with its own employees which AEC determines is subject to the Davis-Bacon Act, the contract will be modified as appropriate to incorporate the provisions relative to labor and wages required by law.

"(b) Should the Laboratory Director desire a review of any determinations with respect to the applicability of the Davis-Bacon Act, written requests for such reviews may be submitted to the AEC General Manager for consideration and resolution."   App. 62.

[15] DOE guidelines for such determinations are set forth in 41 CFR Subpart 9–18.7 (1979).   The regulations provide that the Act does not cover, *inter alia:* "[c]ontracts for servicing or maintenance work in an existing plant, including installation or movement of machinery or other

In April 1975, respondent Stanley E. Coutu, a former employee of petitioner, brought suit in the United States District Court for the Northern District of Illinois on behalf of himself and other mechanics and laborers similarly situated, seeking more than $5 million in damages on the theory that petitioner had violated the Davis-Bacon Act by failing to pay prevailing wages for construction work performed by its employees under the contract with the AEC. Respondent had been employed by petitioner as an electronics technician from September 25, 1972, until September 10, 1975. During that time, he was compensated in accordance with the wage schedules for the "technician" classification set forth in the contract. Respondent's duties involved monitoring computers, providing assistance to scientific personnel, supervising accelerator operation, and recordkeeping. He also would make minor repairs to malfunctioning equipment, assemble prefabricated items, and assist in connecting power sources to experimental equipment. Respondent's supervisors typically were high-rated technicians, engineers, and physicists.

Respondent's complaint was in seven counts. The first alleged that petitioner had failed to pay "the minimum wages

equipment, and plant rearrangement, which involve only an incidental amount of work . . . that would otherwise be considered construction, alteration and/or repair," § 9–18.701–51 (a)(3); and contracts for work involving "[e]xperimental development of equipment, processes and devices, including assembly, fitting, installation, testing, reworking, and disassembly." § 9–18.701–52 (a)(4).

The regulations make clear, however, that "[t]he classification of a contract as a contract for operational or maintenance activities does not necessarily mean that all work and activities at the contract location are classifiable as outside of Davis-Bacon Act coverage." The procuring officer is thus charged with scrutinizing proposed work assignments in order to ensure that "[c]ontractors whose contracts do not contemplate the performance of covered work with the contractor's own forces are neither asked nor authorized to perform work within the scope of the Davis-Bacon Act. If the actual work assignments do involve covered work, the contract should be modified to include applicable provisions of the Davis-Bacon Act." § 9–18.701–52 (b).

required to be paid pursuant to the said contract and the prevailing wage determinations of the Secretary of Labor and the Davis-Bacon Act." App. 4 The second alleged that the contract was within the purview of the Davis-Bacon Act and that the contract by its terms provided for payment "at the legal wage rate applicable to the work actually performed." *Id.*, at 6–7. The remaining counts rested on common-law bases, for which pendent federal jurisdiction was asserted.

On October 8, 1975, the District Court dismissed respondent's first cause of action on the ground that it was not "totally borne out" by the contract. *Id.*, at 22. The court, however, denied petitioner's motion to dismiss the second count and the pendent claims. It relied on the Seventh Circuit's first decision in *McDaniel* v. *University of Chicago*, 512 F. 2d 583 (*McDaniel I*), vacated and remanded, 423 U. S. 810 (1975), judgment re-entered on remand, 548 F. 2d 689 (1977) (*McDaniel II*), cert. denied, 434 U. S. 1033 (1978). *McDaniel I* held that the Davis-Bacon Act conferred an implied private right of action upon an employee seeking to enforce a contractor's commitment to pay prevailing wages.[16] The Dis-

---

[16] Like this case, *McDaniel* was a class action for back wages brought by an employee under an AEC contract which provided that work subject to the Act was to be subcontracted, rather than performed by the contractor's own employees. In *McDaniel*, however, the plaintiff alleged that the contract contained prevailing wage stipulations, and, for the purpose of the summary judgment motion, the defendant did not deny that allegation. See 512 F. 2d, at 584; 548 F. 2d, at 695. Defendant also did not contravene the plaintiff's allegation that the express remedies provided by the Act were unavailable. 512 F. 2d, at 587. Assuming these facts to be true, the Court of Appeals held in *McDaniel I* that inasmuch as the statutory remedies provided in the Act had proved ineffective, "we should be especially 'alert to provide such remedies as are necessary to make effective the congressional purpose,'" *ibid.*, quoting *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964). Accordingly, the Court of Appeals held that the complaint stated a cause of action under the Act.

This Court subsequently granted certiorari, and vacated and remanded

trict Court reasoned that the AEC letter of April 6, 1972, interpreting Art. XXXIII of the contract, left open the possibility that petitioner's employees had performed work covered by the Act pursuant to proper determinations by the AEC. The court accordingly gave respondent "leave to show that the Secretary of Labor through [AEC] has made Davis-Bacon Act determinations with respect to the alleged contract, and that [respondent] and the class have performed such work at [petitioner's] direction, pursuant to the contract." App. 25.

After discovery, petitioner moved for summary judgment. In support of its motion, petitioner submitted an affidavit of the chief legal counsel for the Fermi Laboratory, which stated that "[n]o Davis-Bacon Act . . . stipulations requiring the payment of prevailing wages have ever been made a part of or incorporated in [the] Contract." *Id.*, at 31–32. The District Court noted that respondent "as much concedes that the contract fails to include Davis-Bacon specifications," and it found that "[o]n the present state of the record it is clear that no Davis-Bacon Act determinations have been made a part of this contract." *Id.*, at 32–33. After reviewing the statutory and regulatory framework of the Act, the court concluded that "it would be improper for this court to declare in the first instance that this contract is now subject to the Davis-Bacon Act and to make appropriate wage determinations for the parties." *Id.*, at 34. The court therefore dismissed the second count and, "in the exercise of its discre-

*McDaniel I* for reconsideration in the light of *Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412 (1975), and *Cort* v. *Ash,* 422 U. S. 66 (1975). On remand, the Court of Appeals reaffirmed its earlier opinion, again stressing that "the plaintiffs-appellants allege that the government contract with appellee *did* contain the prevailing wage requirement, and appellee does not deny it." 548 F. 2d, at 695 (emphasis in original). Thereafter, defendant petitioned for certiorari; as indicated in the text, certiorari was denied.

tion," *ibid.*, declined to assume jurisdiction over the pendent state-law claims.

The United States Court of Appeals for the Seventh Circuit reversed and remanded the case. 595 F. 2d 396 (1979). That court recognized that the affidavit submitted by petitioner tended to disprove that there were express Davis-Bacon Act stipulations in the contract; it determined, however, that summary judgment on the second count was not appropriate, since "there may have been other evidence that the contract was one for Davis-Bacon Act work, in which case the required stipulations arguably become a part of the contract by operation of law." *Id.*, at 398. Reasoning from its prior opinions in *McDaniel I* and *II,* the court concluded that "if the [petitioner] actually performed [Davis-Bacon Act] work with its own employees at the Fermi Laboratory, [respondent and his class] became entitled to the prevailing wages in Kane County where the work was to be performed." 595 F. 2d, at 399. After rejecting petitioner's alternative argument that exhaustion of administrative remedies was required, the court remanded the case to allow respondent the opportunity on remand to demonstrate, if he could, that petitioner had used respondent and his class to perform Davis-Bacon construction work at the Fermi Laboratory. *Id.*, at 402.

Because of the importance of the implied-right-of-action issue, we granted certiorari. 445 U. S. 925 (1980).

## III

Before us, petitioner makes two major arguments. It contends first that the federal courts do not have jurisdiction to make coverage, classification, or wage determinations under the Davis-Bacon Act. Alternatively, petitioner contends that Congress did not intend that the Davis-Bacon Act be enforced through private actions. Because we conclude that the Act does not confer a private right of action for back wages under a contract that administratively has been deter-

mined not to call for Davis-Bacon work,[17] we find it unnecessary to reach the broader question whether federal courts have any jurisdiction to review agency coverage and classifi-

---

[17] Respondent contends that the issue of an implied right of action under the Act was not raised in the District Court and the Court of Appeals, and that, therefore, it is not properly before this Court. In addition, he asserts that the AEC viewed this contract as one covered by the Act, and thus that the case does not present the question whether the Act confers an implied right of action on an employee under a contract that has been predetermined administratively not to call for Davis-Bacon work. We find both contentions to be without merit.

First, our reading of the record leads us to conclude that the question we decide today was raised and passed upon by the District Court and the Court of Appeals. In its answer to the complaint, petitioner alleged as an affirmative defense that the complaint failed to state a claim upon which relief could be granted because of respondent's failure to allege a contract containing Davis-Bacon provisions or wage stipulations. App. 17. In opposition to petitioner's motion for summary judgment, respondent argued that the absence of Davis-Bacon Act stipulations in the contract was itself a violation of the Act that should not serve to shield petitioner from the implied right of action found in McDaniel. App. 32. In ruling upon petitioner's motion for summary judgment, the District Court characterized the issue as "whether plaintiff class can proceed in this action under the Davis-Bacon Act absent any showing that the government and [petitioner] have made a determination that the contract is subject to the Act's provisions." Id., at 33. Finally, the Court of Appeals stated: "Our decision in the present case flows directly from the McDaniel opinions," which, the court noted, had held that "employees have an implied right of action to sue for wages due under the Act." 595 F. 2d, at 397. "[C]omplications" arose "only from the procedural posture" of this case and from petitioner's "renewed attempt to establish an exhaustion requirement." Ibid.

We are similarly unconvinced by respondent's contention that the contracting agency viewed the contract as one covered by the Davis-Bacon Act. Respondent points out that Art. XXXIII of the contract states that Davis-Bacon work is to be subcontracted, and that the AEC letters construing that clause stipulate that if petitioner's employees do perform Davis-Bacon work, the contract will be modified to include Davis-Bacon Act determinations. But rather than showing that the AEC considered this contract to be one for Davis-Bacon Act work, these provisions demonstrate precisely the opposite. Since the District Court found that the

cation determinations.[18]   Similarly, we do not decide whether the Act creates an implied private right of action to enforce a contract that contains specific Davis-Bacon Act stipulations.[19]

contract was not modified to include Davis-Bacon stipulations, it is clear that the contracting agency did not view the contract as covered by the Act. Thus, this case presents the issue that was not raised in *McDaniel I* and *II*.

[18] As noted above, it is settled that the correctness of wage determinations of the Secretary are not subject to judicial review. See n. 10, *supra*.

[19] Compare *McDaniel* (Act confers implied private right of action to enforce prevailing wage stipulations) with *United States ex rel. Glynn* v. *Capeletti Bros.*, 621 F. 2d 1309, 1312, n. 10 (CA5 1980) (disapproving *McDaniel*).

While we recognize that some of our reasoning arguably applies to the question whether the Act creates *any* implied right of action, we have no reason to reach that broader issue here.   Further, we note that there is some question whether that issue is properly before us in light of the following colloquy at oral argument:

"QUESTION: Mr. Mann [attorney for petitioner], could I just be sure I understand your position.   Assume here there had been a predetermination that some part of the construction work on the laboratory would be covered by Davis-Bacon. And the laboratory did not pay those— and it was performed by their own people.   And supposing an employee didn't know about that till the contract was performed and then he had gotten less than the Davis-Bacon Act provided, would he have in your view of the law . . . a private cause of action against your client for the difference between what he was paid and what he actually should have been paid?

"MR. MANN: We have taken the position on that question . . . that there is under the Act no private right of action at all, even to recover under express provisions.   There may be a right of action in a state court, under a state common law theory of third-party beneficiary, but not in federal court, because there's no real federal question there; it's a contract question involved there.   So we've taken the position that even if there were an express contract that there would not be a private right to go to court.

"QUESTION: Did you take that position in the 7th Circuit?

"MR. MANN: . . . [T]hat question was not asked in the 7th Circuit, and that issue was not actually before us.

Relying on *McDaniel*,[20] respondent argues that it must be assumed that no statutory relief is available to him, and that therefore the implication of a private right of action is necessary to effectuate the purpose of Congress in passing the Act. But as the Court's recent opinions have made clear, the question whether a statute creates a private right of action is ultimately "one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 578 (1979). See *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16 (1979). In order to determine whether Congress intended to create the private right of action asserted here, we consider three factors set forth in *Cort* v. *Ash,* 422 U. S. 66, 78 (1975), that we have "traditionally relied upon in determining legislative intent": the "language and focus of the statute, its legislative history, and its purpose." See *Touche Ross,* 442 U. S., at 575–576. We conclude that each of these factors points to the conclusion that Congress did not intend to create a private right of action in favor of an employee under a contract that does not contain prevailing wage stipulations.[21]

---

"QUESTION: But you didn't raise that in the 7th Circuit?

"MR. MANN: That's correct.

"QUESTION: Or in the trial court?

"MR. MANN: In the trial court the question of the private right of action per se was raised in the context of the jurisdiction of the court to revise the contract. That is, we didn't really address the issue whether in general there is a private right to enforce a specific clause, but whether there is a private right to obtain the court determination of the fundamental issues of coverage, of classification, of rate, that was the issue presented to the trial court." Tr. of Oral Arg. 8–9.

[20] In *McDaniel,* the Court of Appeals accepted as true respondent's allegation that no funds had been withheld by the Government contracting agency and that no Miller Act payment bond had been filed. See n. 16, *supra.*

[21] Given this conclusion, we find it unnecessary to consider the fourth *Cort* factor, *i. e.,* whether the cause of action is "one traditionally relegated

## A

We turn first to the language of the Act itself. See *Transamerica*, 444 U. S., at 16; *Touche Ross*, 442 U. S., at 568. Section 1 of the Act states that the advertised specifications for every federal construction contract in excess of the specified amount "shall contain" a provision stating the minimum wages to be paid laborers and contractors, which wages shall be based on those the Secretary determines to be prevailing in the locality. Section 1 further provides that "every contract based upon these specifications shall contain a stipulation" that the contractor shall pay wages "not less than those stated in the advertised specifications."

The Court's previous opinions have recognized that "[o]n its face, the Act is a minimum wage law designed for the benefit of construction workers." *United States* v. *Binghamton Constr. Co.*, 347 U. S. 171, 178 (1954); *Walsh* v. *Schlect*, 429 U. S. 401, 411 (1977). But the fact that an enactment is designed to benefit a particular class does not end the inquiry; instead, it must also be asked whether the language of the statute indicates that Congress intended that it be enforced through private litigation. See *Transamerica*, 444 U. S., at 17–18.[22] The Court consistently has found that Congress intended to create a cause of action "where the

to state law." *Cort* v. *Ash*, 422 U. S., at 78. See *Touche Ross*, 442 U. S., at 579–580 (BRENNAN, J., concurring) (when neither statute nor legislative history indicates an intent to create a federal right in favor of the plaintiff, "the remaining two *Cort* factors cannot by themselves be a basis for implying a right of action").

[22] In *Transamerica*, the Court refused to imply a private cause of action under § 206 of the Investment Advisers Act of 1940, 54 Stat. 852, as amended, 15 U. S. C. § 80b–6, since that provision "simply proscribes certain conduct, and does not in terms create or alter any civil liabilities." 444 U. S., at 19. The Court noted: "Section 206 of the Act . . . concededly was intended to protect the victims of the fraudulent practices it prohibited. But the mere fact that the statute was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their behalf." *Id.*, at 24.

language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case." *Cannon* v. *University of Chicago,* 441 U. S. 677, 690, n. 13 (1979). Conversely, it has noted that there "would be far less reason to infer a private remedy in favor of individual persons" where Congress, rather than drafting the legislation "with an unmistakable focus on the benefited class," instead has framed the statute simply as a general prohibition or a command to a federal agency. *Id.,* at 690–692. Section 1 of the Davis-Bacon Act requires that certain stipulations be placed in federal construction contracts for the benefit of mechanics and laborers, but it does not confer rights directly on those individuals. Since § 1 is simply "phrased as a directive to federal agencies engaged in the disbursement of public funds," 441 U. S., at 693, n. 14,[23] its

---

[23] In *Cannon,* the Court found an implied right of action under Title IX of the Education Amendments of 1972, § 901 (a), 86 Stat. 373, as amended, 20 U. S. C. § 1681, which provides that "[n]o person in the United States shall, on the basis of sex, . . . be subject to discrimination under any educational program or activity receiving Federal financial assistance." As indicated in the text, however, it pointed out that "[t]here would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." 441 U. S., at 690–693.

Further, the Fifth Circuit in *Capeletti,* 621 F. 2d, at 1313–1314, noted that *Cannon* distinguished the language of an alternative version of Title XI that Congress did not adopt:

" ' The Secretary shall not make any grant . . . nor . . . enter into any contract with any institution of higher education . . . unless the . . . contract . . . for the grant . . . contains assurances satisfactory to the Secretary that any such institution . . . will not discriminate on the basis of sex.' " See 441 U. S., at 693, n. 14.

The court in *Capeletti* pointed out that there are "obvious similarities" between the language of the rejected alternative version of Title IX and § 1 of the Davis-Bacon Act: "Neither section 1 of the Davis-Bacon Act

language provides no support for the implication of a private remedy.

Moreover, § 3 of the Act demonstrates that in this context, as in others, "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross*, 442 U. S., at 572. Under § 1 of the Act, the contracting agency is entitled to withhold "so much of accrued payments" as may be considered necessary to pay to laborers and mechanics the difference between "the rates of wages required by the contract" and the rates actually paid. If the wages so withheld are insufficient to reimburse the laborers and mechanics, then § 3 confers on them the same "right of action and/or intervention" conferred by the Miller Act on laborers and materialmen. The absence of a comparable provision authorizing a suit for back wages where there are *no* prevailing wage stipulations in the contract buttresses our conclusion that Congress did not intend to create such a remedy.[24]

## B

The legislative history of the Davis-Bacon Act provides further support for the result we reach. The Act was "designed to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area." House Committee on Education and Labor, Legislative History of the Davis-Bacon Act, 87th

---

nor the proposed Title IX statute cited in *Cannon* focuses on the benefited class in its right—or duty—creating language. Instead, in both instances the duty created by the statutory language is imposed upon federal agencies to ensure that certain provisions are included in federal contracts." 621 F. 2d, at 1314.

[24] The Court has observed that "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 458 (1974). There is some evidence that Congress intended the suit on the contractor's bond to be the sole method of enforcing the obligations imposed by the Act. See n. 28, *infra.*

774

Cong., 2d Sess., 1 (Comm. Print 1962) (Legislative History). Passage of the Act was spurred by the economic conditions of the early 1930's, which gave rise to an oversupply of labor and increased the importance of federal building programs, since private construction was limited. See Thieblot, at 7; Elisburg, Wage Protection Under the Davis-Bacon Act, 28 Lab. L. J. 323, 324 (1977); S. Rep. No. 1445, 71st Cong., 3d Sess., 1 (1931). In the words of Representative Bacon, the Act was intended to combat the practice of "certain itinerant, irresponsible contractors, with itinerant, cheap, bootleg labor, [who] have been going around throughout the country 'picking' off a contact here and a contract there." The purpose of the bill was "simply to give local labor and the local contractor a fair opportunity to participate in this building program." 74 Cong. Rec. 6510 (1931).[25]

As originally enacted in 1931, ch. 411, 46 Stat. 1494, the

---

[25] Mr. Bacon continued:

"I think that it is a fair proposition where the Government is building these post offices and public buildings throughout the country that the local contractor and local labor may have a 'fair break' in getting the contract. If the local contractor is successful in obtaining the bid, it means that local labor will be employed, because that local contractor is going to continue in business in that community after the work is done. If an outside contractor gets the contract, and there is no discrimination against the honest contractor, it means that he will have to pay the prevailing wages, just like the local contractor." 74 Cong. Rec. 6510 (1931).

See id., at 6505 (remarks of Rep. Welch); 6510 (remarks of Rep. LaGuardia); 6512 (remarks of Rep. Norton); 6512 (remarks of Rep. Cochran); 6513 (remarks of Rep. Briggs); 6513–6515 (remarks of Rep. Granfield); 6515–6517 (remarks of Rep. Kopp); 6517–6518 (remarks of Rep. Fitzgerald); 6519 (remarks of Rep. Condon); 6520 (remarks of Rep. Zihlman). See also Hearings on H. R. 16619 before the House Committee on Labor. 71st Cong., 3d Sess., 19–21 (1931) (statement of Rep. Bacon); Hearings on S. 5904 before the Senate Committee on Manufactures, 71st Cong., 3d Sess., 9, 23 (1931); S. Rep. No. 1445, 71st Cong., 3d Sess., 2 (1931); H. R. Rep. No. 2453, 71st Cong., 3d Sess., 2 (1931).

Act required that every federal contract in excess of $5,000 in amount for "construction, alteration, and/or repair of any public buildings" contain a provision stating that the rate of wages paid laborers and mechanics would not be less than the prevailing rate for similar work in the locality; the Act further required that every contract contain a provision stating that disputes as to what the prevailing wage was on any given project were to be conclusively determined by the Secretary if the contracting officer was unable to resolve the controversy. The original Act thus did not provide for predetermination of prevailing wages by the Secretary; it also did not establish any enforcement mechanism.[26]

Congress soon concluded, however, that the Act as originally drafted was inadequate. Discontent focused on the lack of effective enforcement provisions and the "postdetermination" of the prevailing wage. Legislative History 2. Contractors called for predetermination of prevailing wages, claiming that they had been put to unexpected expense by postcontract determinations that the prevailing wage was higher than the rate upon which they had based their bids. *Ibid.;* Hearings on H. R. 12 et al. before the House Committee on Labor, 72d Cong., 1st Sess., 8, 12, 14, 50–51, 54–55, 58, 65 (1932). While the labor movement was divided on this issue, most of the national leadership opposed predetermination. Legislative History 2. See 75 Cong. Rec. 12379 (1932) (remarks of Rep. Ramspeck); Hearings on

---

[26] The decision to eschew both predetermination of wages and penalty provisions was deliberate. In the words of the Secretary:

"May I say that what prompted us to draft or suggest this bill in its present form was that we believed that 90 per cent of the controversies that may arise hereafter would settle themselves and that instead of endeavoring to fix a prevailing wage rate in advance we were all of the opinion that by the simple insertion of these provisions in contracts made with the contractors we could accomplish the desired results." Hearings on H. R. 16619 before the House Committee on Labor, 71st Cong., 3d Sess., 2–3 (1931).

H. R. 12, at 24, 114, 116, 122–123. Labor was united, however, in calling for the establishment of an enforcement mechanism. Legislative History 2. See Hearings on H. R. 12, at 122–123; 75 Cong. Rec. 12379 (1932) (remarks of Rep. Ramspeck).

In 1932, both Houses of Congress passed an amendment to the Act providing for predetermination of prevailing wages by the Secretary and for penalties for failure to pay the rate "stated in the advertised specifications and made a part of the contract." See S. 3847, 72d Cong., 1st Sess. (1932). The bill, however, was vetoed by the President. See Veto Message, S. Doc. No. 134, 72d Cong., 1st Sess. (1932). But in 1935, Congress succeeded in adding the predetermination and enforcement provisions found in the current statute. Act of Aug. 30, 1935, 49 Stat. 1011.

The legislative history accompanying these amendments is significant in two respects. First, it indicates that Congress amended the Act to provide for predetermination of wages not only in order to end abuses,[27] but "so that the contractor may know definitely in advance of submitting his bid what his approximate labor costs will be." S. Rep. No. 1155, 74th Cong., 1st Sess., 2 (1935); H. R. Rep. No. 1756, 74th Cong., 1st Sess., 2 (1935). Second, it demonstrates that Congress intended to give laborers and mechanics only "the same right of action against the contractor and his sureties in court

---

[27] The House and Senate Reports stated that predetermination of wages "would strengthen the present law considerably since at present the Secretary of Labor is not permitted to fix the minimum wage rates until a dispute has arisen in the course of construction. In practice this has meant that in the early stages of the contract, unscrupulous contractors have defied orders of the contracting officers to pay the prevailing rate until a formal adjudication has been requested of the Secretary of Labor. This means that laborers and mechanics underpaid until the decision was rendered had no redress since it has been held that the decisions of the Secretary could not operate retroactively." S. Rep. No. 1155, 74th Cong., 1st Sess., 2–3 (1935); H. R. Rep. No. 1756, 74th Cong., 1st Sess., 2–3 (1935).

which is now conferred by the bond statute." S. Rep. No. 1155, at 2; H. R. Rep. No. 1756, at 2.[28] To imply a private right of action here would be to defeat each of these congressional objectives.

The legislative history of the 1964 amendment to the Act also cuts against respondent's position. In 1964, Congress considered and passed H. R. 6041, 88th Cong., 1st Sess., a bill to amend the Act in order to include fringe benefits within the definition of wages. Pub. L. 88–349, § 1, 78 Stat. 238. While H. R. 6041 was under consideration, Representative Goodell introduced a bill that would have amended the

---

[28] The bond statute to which the Reports that accompany the amendments refer is the Heard Act, ch. 280, 28 Stat. 278, from which the Miller Act derived. At the time of the 1935 amendments to the Davis-Bacon Act, it was well established that the failure to supply a contractor's bond did not give rise to a private right of action under the Heard Act. See *United States ex rel. Zambetti v. American Fence Constr. Co.*, 15 F. 2d 450 (CA2 1926); *Strong v. American Fence Constr. Co.*, 245 N. Y. 48, 156 N. E. 92 (1927). In *Strong,* then Chief Judge Cardozo wrote for a unanimous court:

"Congress has said that contractors shall be liable to materialmen and laborers in an amount to be made determinate by the giving of the bond. The statutory liability, which in turn is inseparably linked to the statutory remedy, assumes the existence of a bond as an indispensable condition. Till then, there is neither Federal jurisdiction nor any right of action that can rest upon the statute." *Id.,* at 52, 156 N. E., at 93.

While *Strong* held that laborers and materialmen might recover as third-party beneficiaries in state court if the contractor had breached a *promise* to provide a bond, *id.,* at 53, 156 N. E., at 93, it stressed that no cause of action existed under the Heard Act unless a bond in fact had been filed. The Miller Act, which was originally passed by the same Congress that enacted the 1935 amendments to the Davis-Bacon Act, also has been so construed. See *Harry F. Ortlip Co. of Pa. v. Alvey Ferguson Co.,* 223 F. Supp. 893, 894–895 (ED Pa. 1963); *Gallaher & Speck, Inc. v. Ford Motor Co.,* 226 F. 2d 728, 731 (CA7 1955). It would be anomalous to assume that Congress intended that the failure to include Davis-Bacon stipulations in a contract would give rise to a private cause of action, when the failure to file the Heard Act bond had been held to confer no such right.

Act to provide for judicial review of the Secretary's wage determinations at the behest of any aggrieved person, and that also would have conferred a private right of action on any laborer or mechanic who claimed that his employer had "refused or failed to pay the wages that he is required to pay by reason of a wage determination issued by the Secretary of Labor." H. R. 9590, 88th Cong., 2d Sess., § 2, p. 4 (1964). Representative Goodell sought to have the substance of H. R. 9590 considered during the House debate on H. R. 6041. After extended debate on the merits of judicial review of Davis-Bacon determinations, however, the House invoked its rule against nongermane amendments, and therefore refused to consider Mr. Goodell's proposals.[29] 110 Cong. Rec. 1194–1204 (1964).

Since the Goodell amendments were not defeated on their merits, it cannot be said that Congress has flatly rejected the proposition that judicial review should be available under the Act. Nor can the views of this later Congress be treated as determinative of the question whether the Act's drafters intended to preclude any form of judicial review. Nonetheless, we think it significant that both the proponents and opponents of the Goodell amendments assumed that the Act did not contemplate judicial review of determinations made by the Secretary; they differed only over whether the Act should be amended to permit such review. *Ibid.* Further, although much of the debate centered on the desirability of permitting judicial review of wage determinations,[30] respondent errs in contending that that was the sole topic of discussion, for several speakers expressed their view that the Act did not permit judicial review of any determination under the

---

[29] The House subsequently defeated Representative Goodell's attempt to introduce amendments providing for judicial review of fringe benefits determinations. 110 Cong. Rec. 1227–1229 (1964).

[30] See, *e. g., id.,* at 1198 (remarks of Rep. Griffin); 1200 (remarks of Reps. Pucinski and Broyhill); 1201 (remarks of Rep. Fogarty); 1202 (remarks of Rep. Skubitz).

Act whatsoever.[31]  In particular Representative Bell pointed out that workers could not seek judicial review of the Secretary's determination that certain work was " 'the installation of equipment' and not the type of construction work which was subject to Davis-Bacon," and "neither employers nor employees have any recourse except to beg the mercy of the Secretary or prevail upon their Congressman to intercede." [32] *Id.*, at 1201–1202.  Thus, while not dispositive, the debate on the Goodell amendments reinforces the conclusion that it

---

[31] See, *e. g., id.*, at 1197 (remarks of Rep. Goodell) ("The Davis-Bacon Act is the only Federal wage-fixing law on the books where you do not have a provision for aggrieved parties to get into the court and let the judge tell them what Congress meant when it wrote the law"); 1200 (remarks of Rep. Broyhill) (Act evades "our basic concept of checks and balances").  See also S. Rep. No. 963, 88th Cong., 2d Sess., 12 (1964) (dissenting views) ("The Davis-Bacon Act is the only Federal statute regulating wages under which the courts are completely excluded from participation").

[32] There is other evidence that one of the objectives of the Goodell amendments was to provide for judicial review of coverage determinations.  In the early 1960's, a controversy arose over whether work on missile sites constituted "construction, alteration and/or repair" within the meaning of the Act.  See Donahue, The Davis-Bacon Act and The Walsh-Healey Public Contracts Act: A Comparison of Coverage and Minimum Wage Provisions, 29 Law & Contemp. Prob. 488, 495 (1964); Cox, The Davis-Bacon Act and Defense Construction—Problems of Statutory Coverage, in 15th Annual NYU Conference on Labor 151 (1962).  In an attempt to resolve this issue, the Secretary established the Missile Site Public Contract Advisory Committee, which issued a report setting forth criteria for determining whether missile site work was covered by the Act.  See BNA Daily Labor Rep. No. 200, p. E-1 (Oct. 16, 1961).  The report itself triggered disagreement between contractors' associations and construction trade unions, on the one hand, and manufacturers and industrial unions on the other.  BNA Daily Labor Rep. No. 51, pp. A-7 to A-10 (Mar. 14, 1962).  In response, the minority members of the House Labor Committee made clear that they intended to sponsor an amendment to the Act that would provide for judicial review of coverage determinations. *Id.*, at A-11.  See also H. R. Rep. No. 308, 88th Cong., 1st Sess., 23–29 (1963) (dissenting views).

would be inappropriate for this Court to find that the Act implicitly creates the right of action contended for here.

Respondent, however, asserts that a contrary inference must be drawn from the Portal-to-Portal Act of 1947, 61 Stat. 84, as amended, 29 U. S. C. § 251 *et seq.* Relying on the analysis set forth in *McDaniel II,* 548 F. 2d, at 694, respondent points out that § 6 of the Portal-to-Portal Act, 61 Stat. 87, 29 U. S. C. § 255 (a), imposes a 2-year limitation on any cause of action for nonwillful "unpaid minimum wages, unpaid overtime compensation, or liquidated damages" under the Fair Labor Standards Act (FLSA), 29 U. S. C. § 201 *et seq.,* the Walsh-Healey Act, 41 U. S. C. § 35 *et seq.,* or the Davis-Bacon Act. Since the Miller Act imposes a 1-year limitation on suits on the contractor's bond, 40 U. S. C. § 270b (b), respondent contends that the 2-year statute of limitations set forth in the Portal-to-Portal Act not only affirms the existence of a private cause of action under the Act, but excludes the proposition that that cause of action is limited to a suit on the Miller Act bond.

We agree with *amicus* United States, however, that this argument reads too much into the Portal-to-Portal Act. That statute was intended to curtail the numerous suits for unpaid compensation and liquidated damages under the FLSA that were filed after this Court's decision in *Anderson* v. *Mount Clemens Pottery Co.,* 328 U. S. 680 (1946). See *Unexcelled Chemical Corp.* v. *United States* 345 U. S. 59, 61 (1953). Although no portal-to-portal suits had been filed under the Davis-Bacon or Walsh-Healey Acts, see 93 Cong. Rec. 2088 (1947) (remarks of Sens. Donnell and McGrath), Congress chose to include those statutes within the scope of the Portal-to-Portal Act on the ground that they, like the FLSA, related to minimum wages and were therefore affected by the *Mount Clemens* decision. See H. R. Rep. No. 71, 80th Cong., 1st Sess., 5 (1947); 93 Cong. Rec. 2088 (1947) (remarks of Sen. Donnell). The legislative history of the bills that became the Portal-to-Portal Act makes clear, how-

ever, that Congress simply did not recognize that it had created two incompatible statutes of limitations under the Davis-Bacon Act.[33] Moreover, even if the Portal-to-Portal Act had been intended to create a longer statute of limitations for actions under the Davis-Bacon Act than that applicable to suits on the Miller Act bond, respondent has pointed to nothing in the legislative history of the Portal-to-Portal Act that suggests that Congress believed that the Davis-Bacon Act conferred a private right of action for back wages under a contract lacking prevailing wage stipulations; to the contrary, Congress' concern was to foreclose the possibility of portal-to-portal suits for back wages under contracts that did contain Davis-Bacon Act provisions.[34]

---

[33] The Senate bill, S. 70, 80th Cong., 1st Sess. (1947), would have amended only the FLSA "to exempt employers from liability for portal-to-portal wages." S. Rep. No. 37, 80th Cong., 1st Sess. (1947). In contrast, the House bill, H. R. 2157, 80th Cong., 1st Sess. (1947), would have limited portal-to-portal actions under the Davis-Bacon Act and the Walsh-Healey Act as well. The Senate Committee Report on H. R. 2157 acceded to the wider coverage of the House bill; however, rather than adopting the 1-year limitations period set forth in H. R. 2157—which was compatible with the 1-year limitations period of the Miller Act, 40 U. S. C. § 270b (b)—the Senate Committee Report retained the 2-year limitations period of S. 70. S. Rep. No. 48, 80th Cong., 1st Sess., 50–51 (1947). The 2-year limitations period was recommended by the Conference Committee, H. R. Conf. Rep. No. 326, 80th Cong., 1st Sess., 13–14 (1947), and was enacted. 61 Stat. 87.

The Senate Report accompanying H. R. 2157, like the Senate debate that followed, suggests that Congress was not aware that it had created two inconsistent statutes of limitations under the Davis-Bacon Act. The Senate Report erroneously stated that "there is no limitation provision in either the Walsh-Healey or the Bacon-Davis Acts." S. Rep. No. 48, 80th Cong., 1st Sess., 42 (1947). The same unfamiliarity with the Davis-Bacon Act was manifested during the debate on the bill. Senator Donnell, who introduced the bill in the Senate, stated that the Davis-Bacon Act had not been mentioned in the Senate subcommittee hearings on the legislation. 93 Cong. Rec. 2124 (1947). See also id., at 2250, 2253 (remarks of Sen. McGrath); id., at 2352–2353 (remarks of Sen. Barkley).

[34] During the Senate debate on the Portal-to-Portal Act, Senator

## C

Finally, the underlying purpose of the legislative scheme indicates that Congress did not intend to create the right of action asserted by respondent. As noted above, the 1935 amendments added two key features to the Act: administrative predetermination of the minimum wages that the contractor must pay his laborers and mechanics, and a means whereby laborers and mechanics could recover back wages under a contract containing prevailing wage stipulations. The Act thus carefully balances the interests of contractors and their employees. The contractor is able to "know definitely in advance of submitting his bid what his approximate labor costs will be," [35]  S. Rep. No. 1155, at 2, while the laborer or mechanic is given a right of action to enforce the stipulated wages. To imply a private right of action to sue for Davis-Bacon wages under a contract that does not contain prevailing wage stipulations would destroy this careful balance.

In addition, as petitioner and *amicus* United States point out, the implication of a private right of action where there has been no Davis-Bacon determination would introduce substantial uncertainty into Government contracting. In the

---

McGrath argued that the 2-year statute of limitations was unfair to workers, since the "administrative procedures which are necessary to determine the validity of the workman's claim for back wages under the Davis-Bacon Act frequently take a considerable length of time which may very easily run for a period of more than 2 years." 93 Cong. Rec. 2252 (1947). As the United States argues, Senator McGrath's statement strongly suggests that the limitations period of the Portal-to-Portal Act was designed to apply to the explicit statutory remedy set forth in the Davis-Bacon Act.

[35] It is clear, however, that the Secretary's prevailing wage determinations do not constitute a representation that the "specified minima will in fact be the prevailing rates." *United States* v. *Binghamton Constr. Co.*, 347 U. S, at 178. The 1935 amendments were designed to prevent only a postcontract *determination* that the prevailing rate was higher than that on which the successful contractor had based his bid.

case of cost-plus contracts, federal budgeting would be disrupted by a postcontract judicial determination that wages higher than those set forth in the contract must be paid. Fixed-price contracting also would be adversely affected, since it is likely that contractors would submit inflated bids to take into account the possibility that they would have to pay wages higher than those set forth in the specifications.[36] Finally, postcontract challenges would disrupt timely and efficient performance of Government contracts, and might well provoke jurisdictional disputes between construction unions and unions representing nonconstruction workers.[37]

The implication of a private right of action here would undercut as well the elaborate administrative scheme promulgated pursuant to Reorganization Plan No. 14. The goal of that plan was to introduce consistency into the administration and enforcement of the Act and related statutes; to that end, the Secretary and contracting agencies have issued detailed regulations governing, among other things, coverage determinations. The uniformity fostered by those regulations would be short-lived if courts were free to make postcontract coverage rulings. Respondent, however, replies that no administrative functions would be disrupted by judicial intervention, since Davis-Bacon stipulations are incorporated by operation of law into every federal construction contract, regardless of whether the contracting agency has made a coverage determination. But this assertion ignores the fact

---

[36] Significantly, the Comptroller General had recommended that the original Act provide for predetermination of wages precisely because he "feared that contractors would inflate their bids to provide a reserve against higher postdeterminations." Legislative History 2.

[37] The history of the construction of missile sites during the early 1960's reveals that the inclusion of Davis-Bacon stipulations in a contract may give rise to a jurisdictional dispute. See n. 32, *supra*. Hearings on Work Stoppages at Missile Bases, before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, 87th Cong., 1st Sess., 13, 501, 584, 594 (1961).

that the Act does not define the terms "construction, alteration, and/or repair," "public buildings or public works," and "mechanics and/or laborers." [38]   A number of commentators have noted the difficulty of determining whether particular work constitutes "construction" within the meaning of the Act, particularly when the work is performed in the context of an AEC contract involving a nuclear facility.[39]   Like other contracting agencies, AEC and its successors have developed detailed guidelines for determining whether particular work is covered by the Act. See n. 15, *supra*. Whatever may be the merits of allowing judicial review of these complex coverage determinations prior to contracting, it clearly would be inappropriate for a court to substitute its judgment for that of the contracting agency in a private action brought after the contract was let.

IV

In sum, to imply a private right of action under these circumstances would severely disrupt federal contracting. Nothing in the language, history, or purpose of the Davis-Bacon Act suggests that Congress intended that result.   Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[38] Accordingly, as petitioner points out, respondent's reliance on cases such as *G. L. Christian & Associates* v. *United States,* 160 Ct. Cl. 1, 11–17, 312 F. 2d 418, 424–427 (termination-for-convenience clause incorporated in contract by operation of law), reargument denied, 160 Ct. Cl. 58, 60–67, 320 F. 2d 345, 347–351, cert. denied, 375 U. S. 954 (1963), is misplaced, since the Act is not self-implementing.

[39] See Thieblot, at 26–27, 64–67, 143–146; Donahue, The Davis-Bacon Act and the Walsh-Healey Public Contracts Act: A Comparison of Coverage and Minimum Wage Provisions, 29 Law & Contemp. Prob. 488, 494–497 (1964); Price, A Review of the Application of the Davis-Bacon Act, 14 Lab. Law J. 614, 619–621 (1963).