**FIDELITY FINANCIAL CORPORATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK OF SAN FRANCISCO, Defendant.**

No. C–82–1389 SW.

United States District Court, N.D.Cal.

Oct. 3, 1983.

886

888

Barry D. Hovis, Angell, Holmes & Lea, San Francisco, Cal., Palmer B. Madden, Stephen L. Kostka, Van Voorhis & Skaggs, Walnut Creek, Cal., for plaintiff.

Kirkpatrick, Lockhart, Hill, Christopher & Phillips, George L. Christopher, Ronald W. Stevens, Steven W. Grafman, Christopher B. Hanback, Washington, D.C., Pillsbury, Madison & Sutro, Charles B. Renfrew, James N. Roethe, Timothy S. Wahl, Gen. Counsel, Federal Home Loan Bank, San Francisco, Cal., for defendants Federal Home Loan Bank of San Francisco, et al.

Denis T. Rice, Robert E. Gooding, Jr., Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., special counsel for Federal Sav. & Loan Ins. Corp. as receiver.

McCutchen, Doyle, Brown & Enersen, Bruce G. Vanyo, San Francisco, Cal., for non-party witness Larry Cushing.

Cooley, Godward, Castro, Huddleson & Tatum, Paul A. Renne, San Francisco, Cal., for Federal Home Loan Bank Bd.

Hopkins & Sutter, Robert W. Patterson, John L. Rogers, III, William J. McKenna, Jr., Antony S. Burt, Chicago, Ill., for FSLIC and FHLBB.

## ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANT'S MOTION TO DISMISS

SPENCER WILLIAMS, District Judge.

### ORDER AND MEMORANDUM OF LAW

Defendant Federal Home Loan Bank of San Francisco's (Bank's) motion to dismiss plaintiff Fidelity Financial Corporation's (Fidelity's) claims for failure to state cognizable claims for which relief may be granted, requires this Court to accept Fidelity's allegations of Bank's 'dastardly deeds' in connection with the events leading to its closure and federal receivership, as true. On that premise, defendant's motion is hereby GRANTED in part, and DENIED in part.

The following is a brief summary of Fidelity's contentions, interspersed with facts that are basically undisputed:[1]

In 1974, Bank initiated a special program concerning advances to member associations which, in its opinion, had less-than-rosy financial credentials ("Other Special Credit" (OSC)). This program offered less attractive interest and lending provisions and included: (a) A 2% interest rate penalty surcharge, (b) higher interest rates on "advances" than those charged on regular credit, (c) exclusion of alleged "black sheep" associations from participation in regular programs, (c) mandatory renewal of all maturing regular credit as OSC advances, and (d) certain other restrictions. Fidelity alleges that the OSC program was a purposeful attempt by the Bank to regulate management of the member associations along guidelines considered by Bank to be "prudent" and meting out punishment to those associations which failed to abide thereby.

On October 26, 1979, after the Federal Reserve Board decontrolled interest rates, Fidelity applied to Bank for an advance of $75,000,000 to cover both short term loan commitments and anticipated savings withdrawals. Although it alleges that it had no reason to suspect that its request would be denied, this request was met with regular credit denial and placement into this newly-instituted OSC program.

Fidelity appealed this administrative decision of Bank's staff to the executive branch of Bank—"Credit Exceptions Committee of the Board of Directors"—who, rubber-stamping the staff's recommendations, rejected Fidelity's requests. The Committee referred the matter to the entire Board of Directors, which notified Fidelity, by letter of April 5, 1982, of its refusal to excuse Fidelity from the OSC program.

Fidelity now alleges that all of its ensuing problems with its failing financial condition can be traced to Bank's fateful decision to place it into this punitive interest program.

We note that Fidelity alleges that it was the first, last and only association to be placed in this program.

The receivership action, which is also pending in this court (C–82–1592–SW), focuses attention upon the most visible penultimate effect of Fidelity's deteriorating financial condition—the carefully orchestrated closure and imposition of the FSLIC receivership by the California Savings and Loan Commissioner.[2]

Essentially, Fidelity charges, and we accept for the purpose of the instant motion, that Bank, determined to wrest Fidelity from its then officers and directors, manipulated its statutory authority to lend funds to member associations in order to cast Fidelity into a state vulnerable to imposing a receivership. By this novel, and spiteful abuse of its authority, Bank instead could decide which associations could be crushed beneath the unauthorized and heavily punitive OSC charges. Fidelity seeks to recover approximately $176 million damages: $62 million which it claims represents the excess interest it was forced to pay the Bank for these OSC advances, and the balance representing its consequential damages from the Bank placing it into the OSC program.

Fidelity bases its complaint on four alternative causes of action: (1) that Bank's actions in initiating and placing Fidelity into the OSC program exceeded its statutory authority under 12 U.S.C. § 1421 *et seq.* (Bank Act); (2) that the Bank violated Fi-

---

1. A more complete description of the allegations relating to the events immediately preceding the collapse of the plaintiff's control over the assets and business activities of Fidelity Savings & Loan, are presented in this Court's opinion in a companion case, reported at *Fidelity Savings and Loan Ass'n v. Federal Home Loan Bank Bd.,* 540 F.Supp. 1374, 1379–81 (N.D.Cal.1982); *rev'd* and *rem.,* 689 F.2d 803 (9th Cir.1982).

2. Trial on the propriety of the receivership will commence in coordination with the remaining issue of this case—breach of any fiduciary duties owed to the shareholder here—with evidence segregated, according to its relevancy, for presentation in a bifurcated trial.

delity's rights under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (APA) to certain procedural safeguards prior to its placement in this OSC program; (3) that Bank's actions deprived Fidelity of its constitutional rights of due process and equal protection under the 14th Amendment and; (4) that Bank's actions violated its common law fiduciary duties toward Fidelity (fiduciary duties).

LAW:

Both sides offer general framework and characterizations of Bank's role in attempting to cast the four issues raised by Bank's Motion to Dismiss.

There are also several "red" herrings that both parties offer as emotional catalysts.

■ We note that although these questions, *inter alia*, might do much to focus our passions, they lend little to resolution of the broad issues raised by the defendants' motion.[3]

The "real" issues in this case are: (1) Does Fidelity have an implied private right of action under the Bank Act to challenge the Bank's actions in this Court; (2) Is the Bank an "agency" under the APA, for the purpose of its dealings with Fidelity; (3) Is there any real substance to Fidelity's constitutional challenges to the Bank's economic regulation of its activities; and, (4) Does the Bank Act preempt the common law doctrines applicable to evaluate the parties' dealings, or does it incorporate by reference those standards. We discuss each of these below.

*Bank Act*

■ The Bank Act is a narrowly drawn, and largely unambiguous statute which establishes a system of national and state chartered savings associations under the auspices of a national board with plenary administrative powers, with delegation of certain subsidiary functions to various regional banks. Although the equity investors in successful lending associations would no doubt prosper from the Bank Act by a strengthened market for their services, there is little room for debate as to who Congress intended as the ultimate beneficiaries of this legislation. The Act was primarily a populist measure to encourage private ownership of family homes.[4]

■ Opportunity for this Court to judicially imply private rights of action has been considerably constricted by recent decisions finding those rights rare indeed. Appeals to this Court's discretion to consider equitable arguments in support or opposition to a private right of action under legislation have little place, in light of the rigorous standard which emerges from those recent cases.[5] Even if congressional policy has resulted in an outcome which runs roughshod over common sense and fair play, we are barred from smoothing out the rough edges of the Act in the manner that Fidelity urges here.

**3.** These issues include:
  1. Whether the OSC program is "regulatory" or "punitive."
  2. If Fidelity's payments to the Bank were made voluntarily or, as made under economic and business "compulsion," were they made under "duress" rendering them "involuntary" and thus refundable.
  · 3. Whether the Court has the discretion to award any type of remedies it feels appropriate, regardless of the legal authority under which it pursues this case.
  While we do not criticize the parties for raising these, as well as other issues, we do not consider these peripheral issues here. We do not view these characterization-type questions as determinative of whether plaintiff has a cognizable cause of action under any of the theories presented; they are largely affirmative defenses, which would properly be presented to the finder of fact, or court, at trial on the merits. Some or all of these matters may be relevant at a trial of the question of the Bank's fiduciary obligations, if any.

**4.** It is clear that Congress established this system to increase the flow of available funds to finance the development of an industry to realize the dream then, as now, of creating a nation of affordable privately owned housing.

**5.** Although it is our impression that it would be appropriate for an entity in Fidelity's position to have standing to challenge a particular Board or Bank decision with such drastic ramifications, it is legislative intent, rather than equitable or common sense notions, which must control our disposition of Fidelity's assertion of a private right of action.

Regardless of the allure of Fidelity's arguments that the Bank's development of, and placement of Fidelity into, the OSC program exceeded its statutory authority under the Bank Act, the Bank maintains that Fidelity is without express or implicit standing to challenge Bank's dastardly deeds in this Court under the Bank Act. We agree with Bank.

Fidelity does not have an express private right of action against the Bank under the Bank Act. Fidelity does not contend that the Bank Act expressly confers a private right of action upon member associations to contest the Board's or Bank's actions. The language of the Bank Act does not provide for such a right of action; if there is a private right of action under the Act, it necessarily must·be derived by judicial implication.

Fidelity does not have an implied private right of action against the Bank under the Bank Act. Despite Fidelity's attempt to circumvent the very restrictive interpretation that both the U.S. Supreme Court and the Ninth Circuit has applied to *Cort v. Ash*,[6] recent cases support a drastically narrowing scope of implying private rights of action, and our reading of the most recent Supreme Court opinions, show a marked shift away from reliance upon the private right of action to police statutory obligations of regulated entities.[7]

In *Cort*, the Supreme Court "unanimously decided to modify its approach" of generously conferring private rights of action, in addressing the appropriateness of a private litigant recovering damages for violation of a criminal statute never thought to include a private remedy before. As the Court later summarized its ruling in *Cort*,

> (i)n rejecting that claim the Court outlined criteria that primarily focused on the intent of Congress in enacting the statute under review. The increased complexity of federal legislation and the increased volume of federal litigation strongly supported the desirability of a more careful scrutiny of legislative intent .... Our cases subsequent to Cort v. Ash have plainly stated that our focus must be on 'the intent of Congress' ... 'The key to·the inquiry is the intent of the legislature.'

*Curran, supra* 102 S.Ct. at 1838–39. *Cort* established a four-fold approach to divining congressional intent to afford a private right of action: (1) was the plaintiff a member of the class "for whose especial benefit the statute was enacted"; (2) was there indication of legislative intent, explicit or implicit, either to provide a private right of action or deny one; (3) is it consistent with

---

6. See *Cort*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* marked a readical departure from prior law; *see, e.g., Texas & Pacific Railway Co. v. Rigbsy*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916), which could aptly be summarized as ensuring that where there is a statute, there may be many with standing to bring suit to enforce it. Cort signalled a new restrictiveness; some might say it was a "stopgap" measure to curb expoential growth in federal litigation of new legislatively conferred benefits and property rights.

7. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (implied private right of action under the Commodity Exchange Act); *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (no private right of action under federal water pollution act or marine protection and conservation act); *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (no private right of action

under § 10 of federal rivers appropriations act); *Texas Industries Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (no private right of contribution from antitrust co-conspirators for indemnification of treble damages under either Sherman or Clayton Acts); *Universities Research Association v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) (no private right of action under Davis-Bacon Act to enforce wage rate guidelines); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (no private right of action implied under the Investment Advisors Act); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); (no private right of action under SEA '34 § 17(a)); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (implied private right of action under Title IX); *but c.f., Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (implied private right of action under the SEA '34 § 10(b) "beyond peradventure").

the statute's underlying purpose to grant a private right of action; and, (4) is the cause of action in an area of law traditionally left to the states. While these four tests were, and are still periodically, recited in subsequent case law, there has been an increasingly jaundiced eye turned to argument in favor of such rights.

There are unmistakable indications of the disfavor with which these implied private rights are currently viewed. First, the Supreme Court has collapsed the four "tests" of *Cort* into one comprehensive, and strict, inquiry into congressional intent to provide such a private right. This overshadows all the other "softer" policy inquiries; in almost every post-*Cort* case, the Court's conclusion turned upon what Congress explicitly said—either in the language of the statute, or in the legislative debates accompanying its passage. The analytical "streamlining" evident in the latest batch of Supreme Court opinions is echoed faithfully, and with more severity, in the Ninth Circuit.

In *Osborn v. American Assn. of Retired Persons*, 660 F.2d 740, 743 (9th Cir.1981) [8], the Ninth Circuit refused to imply a private right of action in favor of employees alleging violation of an "equal pay for equal work despite advancing age" statute, on grounds that

> the *sole factor* to be considered in deciding whether a private right of action should be implied under a statute is *whether Congress intended* that the statute's provisions be enforced through private litigation. (...) Factors relevant to evaluation of congressional intent are 'the *language of the statute itself*, its legislative *history*, the underlying *purpose and structure* of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies.

It is obvious that individuals employed pursuant to the Act, such as *appellees, were intended by Congress to benefit*

from enactment of (the Act). To permit implication of a private right of action, *however*, the language of the statute must do *more than confer benefits* ....
*Id.* at 743, *emphasis added.* At first blush, this standard does not bespeak a drastic shift from *Cort*, but as Goodwin, J. points out in his concurrence, this establishes an even stricter standard than *Cort*. In a footnote to the majority opinion, the Ninth Circuit read the post-*Cort* cases as setting a tougher standard for finding congressional intent for a private right of action, and read then recent cases: *Transamerica Mortgage, Sierra Club, Universities Research* and *Touche Ross*

> as having made *clear that express conferrence* of federal rights by the statutory language *is necessary, rather than merely sufficient* for' a court *to find that Congress intended to create* a private right of action when it enacted the statute.

*Osborn, supra* at 743, n. 1, *emphasis added.*

Since *Osborn*, the Circuit has denied an implied right of action to discharged employees allegedly fired in contravention of a federal statute, which prohibited discharge on account of garnishment of their wages. *Le Vick v. Skaggs Companies, Inc.*, 701 F.2d 777 (1983). In *Le Vick*, Norris, J. tersely summarized the standards for implying private rights of action, as having "substantially changed" from

> focusing on whether the purposes of a statute would be achieved by implication of a private right of action, (to) ... focusing on whether Congress intended to create a private right of action, regardless of its purpose in enacting the statute.

*Le Vick, supra* at 779. Obviously, the Ninth Circuit has explicitly "repudiated" the notion that courts should imply private rights of action whenever they feel that such rights would "improve" the statute as written. *Id.*

---

**8.** The best example of the Ninth Circuit's very restrictive interpretation of Cort and its progeny strongly supports the Bank's argument against

granting private rights of action under the Bank Act.

The Supreme Court and the Ninth Circuit have abandoned *"ubi jus, ibi remedium"* ["where there's a right, there's a remedy"] as their guide to implying private rights of action. *See Texas Industries, supra; Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Piper v. Chris-Craft,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). *Le Vick, supra,* would seem to both (1) require we focus on whether Congress intended to provide this remedy to Fidelity, regardless of whether in general it hoped the Board or the regional banks would not misuse their office, and would "play fair and square" with member associations; and, (2) that district and appellate courts read the omission of specific provision for member associations' private right of action as evidence of contrary intent. *Le Vick, supra* at 779. Finally, as recently summarized by the Supreme Court,

> the ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law.

*Touche Ross, supra* 442 U.S. at 578, 99 S.Ct. at 2490 (1979). This quote appears to vitiate Fidelity's attempt to encourage our broad reading upon the third and fourth tests in *Cort.*

■ Fidelity argues, in light of *Cort,* that savings and loan associations were the intended "special beneficiaries" of the Bank Act. A dispassionate review of the legislative history and text of the Act convinces us that would-be homeowners were supposed to be the primary beneficiaries of the greater availability of mortgage money. At most Fidelity can argue that Congress envisioned the associations as necessary conduits by which to disperse mortgages, more or less by private market forces, throughout the U.S. Fidelity was an "incidental beneficiary" of this quasi-regulatory scheme, in much the same way as were the regional Banks, if the system

prospered. But the case law is clear that merely "incidental", or secondary, beneficiaries of a statute do not qualify under the *Cort* "especial beneficiary" standard.[9]

Fidelity urges that this Court permit it a private right of action by adopting the more lenient standard it argues the Sixth Circuit endorsed in *Assoc. of Data Processing Service Organizations v. Fed. Home Loan Bank Board,* 568 F.2d 478 (6th Cir. 1977) (*"ADAPSO"*). In *ADAPSO,* the Sixth Circuit permitted a trade association representing electronic data processors a private right of action under § 11a of the Bank Act. The trade association sought declaratory and injunctive relief in the federal courts restraining the Bank of Cleveland from competing with ADAPSO members' provision of certain computer services to member associations. The Sixth Circuit's reliance upon "legislative ... silence" to find a private right for ADAPSO's challenge is not the law of this Circuit, and appears to have been implicitly reversed by the most recent Supreme Court opinions: *Transamerica Mortgage, Touche Ross, Universities Research,* and the Ninth Circuit opinions in *Osborn, Le Vick,* and *In re Mexico City Aircrash of October 31, 1979; Haley v. Western Airlines,* 708 F.2d 400, 406–08 (9th Cir.1983).

It is our impression, upon reviewing the Supreme Court and Ninth Circuit precedent, that the reasoning and result of *ADAPSO* is anomolous, and although never officially reversed, has never been accepted in this Circuit. Even if this Court were compelled to harmonize our result here with *ADAPSO,* we do not find it supports the propositions for which Fidelity cites it. *ADAPSO provided implication of a private right of action only for declaratory and injunctive relief.*

Additionally, it is becoming increasingly apparent that Congress may be satisfied by providing less than a full complement of available challenges when drafting various statutes. A recent Ninth Circuit case, *Si-*

---

9. *See, e.g., Local Div. 732 etc. v. Metro. Atlanta Rapid Transit Authority,* 667 F.2d 1327, 1335 (11th Cir.1982); *Stern v. Merrill Lynch,* 603 F.2d 1073 (4th Cir.1979); *California v. Sierra Club, supra; Universities Research Assoc. v. Coutu, supra.*

erra Club v. Peterson, 705 F.2d 1475 (1983) has confirmed that the appearance of a statute may convey the impression that less than a full panoply of remedies are intended to be available, by Congressional choice.

In *Lee Construction Co. v. Federal Reserve Bank of Richmond,* 558 F.Supp. 165 (D. Maryland 1982), the district court determined that the Fed. Reserve Banks, analogous to the Federal Home Loan Banks here, were federal "agencies", as well as held that 12 U.S.C. §§ 341 et seq. did not provide plaintiff a private statutory right of action to challenge the regional Federal Reserve Bank's conduct of its affairs in "a prudent and reasonable manner", after considering the same restrictive post-*Cort* precedents we discussed above. In the case of the defendant here, as was the case in *Lee Construction Co.*, supervision and enforcement of the defendant regional bank's compliance with its duties under an enabling statute seemingly has been exclusively entrusted to a regulatory board, instead of shared with private parties. *Lee Construction Co.*, *supra* at 186, n. 31.

■ Although we readily acknowledge an inherent danger in using legislative history, or comparing and contrasting similarly drafted legislation, as a tool in interpreting the Bank Act, we note that a second savings industry bill, the Home Owners Loan Act, the focus of extensive scrutiny, has similarly been deemed without an implied private right of action. *First Hawaiian Bank v. Alexander,* 558 F.Supp. 1128 (D.Haw.1983). While we do not feel compelled to concur with the Defendant's arguments against Plaintiff's cause of action under the Bank Act in light of *First Hawaiian Bank,* we concur in the method of analysis employed there, and reach a similar conclusion here. Id. at 1131.[10] Denying Plaintiff an implied private right of action to challenge the statutory authority

of the Bank to institute, and to classify associations as appropriate candidates for, the OSC program, is in harmony with the Ninth Circuit's narrow construction of available direct challenge to the Bank Act by regulated entities or their investors. *See, Fahey et al. v. O'Melveny & Meyers, et al.,* 200 F.2d 420, 444 (9th Cir.1952).

Since Fidelity has neither an express, nor implied, private right of action to bring suit upon the Bank's compliance with provisions of the Bank Act, we must grant the Bank's motion to dismiss Fidelity complaint founded upon the Act's provisions.

*APA claim*

Fidelity claims restitution of the amounts the Bank charged in under the OSC program is appropriate, if the Bank's decisions in that regard were improper under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1), or § 701(b)(1). The Bank asserts that Fidelity's reliance upon the APA is infirm for two principal reasons: (A) that the Bank is not a "federal agency", and thus not within the APA's ambit; and, (B) only declaratory or injunctive relief, not monetary restitution is appropriate under the APA.

(A) IS THE BANK AN "AGENCY", AS THAT TERM IS DEFINED IN THE APA?

■ The Bank maintains that it is a "government controlled corporation", rather than an "agency". We reject this hypertechnical distinction mustered by the Bank as a formalistic attempt to cast itself as a *sui generis* hybrid to avoid the accountability that the APA would demand of it. Whether one prefers a literal, or a teleological, approach to characterization, it is clear to this Court that the Bank is an "agency" for the purpose of invoking this Court's review under the APA.

To the extent that we as literalists require precedent, *Fahey, supra,* would sup-

---

10. We acknowledge defendant's attempts to distinguish the HOLA from the Bank Act, for purposes of denying plaintiff a cause of action upon alleged breach of its (defendant's) fiduciary obligations to its member associations.

Clearly defendant may not have it both ways; we conclude that Congress could not have intended that the accountability of the regulated entities be *completely* internally inconsistent, depending upon which form a challenge assumed.

port this conclusion.[11] *Fahey* was an action under the Bank Act by the investors (member associations and other interests) in the former federal home loan bank located in Los Angeles, against its successor: the newly-formed Bank of San Francisco, for damages which allegedly resulted from the merger of two regional banks, then in Portland and Los Angeles, into one facility in San Francisco. In *Fahey*, the Ninth Circuit rejected the disgruntled investors' argument that the Los Angeles branch's closure was a confiscation of private property interests, and held

> that the Congress of the United States ... intended to, and did, create a Federal agency and instrumentality of the legislative branch of the federal government to carry out and discharge important governmental function, to wit, the furnishing of reserve banking facilities for savings and loan associations and similar institutions within a district created by the Board.

> We hold that all Federal Home Loan Banks within the system are, and operate as, public banking agencies and instrumentalities of the federal government, and such (cannot import the common law corporate doctrines to support) a justiciable (and proprietary) interest in their continued existence.

*Id.* at 446–47.

Holding the Bank to be a federal agency accommodates our interest in providing investors in these S & Ls with the opportunity for meaningful *ex ante* administrative and judicial review under the APA, as a procedural safeguard from "functionally" dispositive rule-making by the Bank, without frustrating the apparent intent of the Bank Act not to provide an *ex post* damage remedy for injuries inflicted by these rules.

### (B) CAN FIDELITY RECOVERY MONETARY DAMAGES UNDER THE APA?

■■■■ Despite the appeal of Fidelity's novel circumlocution, we cannot agree that restitution, in the form of monetary damages, is available under the APA. The law on this issue is unambiguous: the APA does not confer upon federal courts the authority to assess and levy monetary relief ex post to compensate those injured by tortious agency action. The APA was intended to, and can, when appropriately invoked, protect those threatened by adverse agency action with swift anticipatory judicial review of those decisions.

Fidelity should have sought this Court's review of the Bank's sinister motives and nefarious conduct, which it contends was without legislative authority, when the noose with the OSC "lead sinker" was first slipped around its neck. Its failure to take timely recourse to the avenue of relief provided under the APA, whether for business reasons or otherwise, renders Fidelity's plea for redress a bit much, and a bit too late.

By this conclusion, this Court neither contradicts common sense, nor frustrates congressional intent, as would our endorsement of either party's positions *in toto*. Interestingly, while to provide Fidelity a private right to seek monetary damages under the APA after the Bank had injured its interests would directly contravene the ruling made above; *i.e.*, that the Bank Act does not provide for an implicit or explicit private right of action, ruling that Fidelity could have sought, under 5 U.S.C. § 706, a court ruling "compel(ling) agency action unlawfully withheld", or "hold(ing) unlawful and set(ting) aside" agency action found to be arbitrary or in excess of statutory authority, would be entirely sensible. *See Kester v. Campbell*, 652 F.2d 13 (9th Cir. 1981). The result reached here coordinates the language and purpose of both the Bank Act and the APA, permitting an expedited judicial review of the " 'life and death' type

---

11. We note, however, that we have been instructed in the companion case, 540 F.Supp. 1374 (N.D.Cal.1982), to interprete the applicable law without the meticulousness traditionally applied to their interpretation, yielding instead to the "teleological" result. In this instance, we are certain that the two merge; that, as a *quid pro quo* for expedited seizure of private assets, without insistence upon the "ceremonial formalit(ies)" of law, we must deem the Bank a federal agency for this purpose. *See Fidelity Sav. & Loan*, 689 F.2d at 813.

of control" which the Bank Act permits the Board and Bank, and yet does not permit Fidelity to turn either on its end, and thus leapfrog well-conceived limitations in both.

Reviewing Fidelity's allegations in both this action and the receivership action before the Court, this Court has much empathy with Fidelity's plight. We assume, as we must for purposes of this motion, that the Bank officials instigated the OSC program with the hope and purpose of saddling Fidelity with insurmountable obstacles to financial recovery because of personal differences of opinion regarding prudent banking practices, as well as personality clashes. However personally abhorrent we deem this display of arrogance and abuse of delegated responsibilities, the Circuit has specifically declined to extend special procedural safeguards to members' interests, despite foreseeable frictions between a member association(s) in failing financial straits and a regulatory body with discretion to apply either the carrot of plentiful short-term bailout, or the whip of the heavily punitive terms of the OSC. By assuming that S & L investors do not plunge "blindly" into a heavily regulated industry, the Ninth Circuit demands that Fidelity accept both burden and benefits of the "plenary control" of the Board and Bank. *Fahey, supra,* at 444.

*Constitutional claims*

Fidelity's constitutional arguments are interesting, but unhelpful. There are two constitutional arguments: substantive due process/equal protection and procedural due process. We discuss each briefly, but note at the outset that the amount of actual judicial review available under either theory is minimal, especially when considered in light of *Fahey,* the very deferential stance appropriate in a due process review of economic regulation, and the inherent fraility of Fidelity's argument that it had a "property" interest in receiving non-OSC advances.

(A) SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION:

■ For the purposes of this analysis, we assume that the Bank is a quasi-legislative entity, with the appropriate delegation of rule-making authority from the Board. As economic regulation, this Court's scrutiny of the OSC program under substantive due process and equal protection challenge is proper only with the greatest deference: is the OSC classification, and Fidelity's participation under its terms, so "patently arbitrary" and "utterly lacking in rational basis", that the court cannot conceive of any possible legitimate basis that the Bank might have had in its adoption? *U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 168, 101 S.Ct. 453, 456, 66 L.Ed.2d 368 (1980).

Under such a deferential standard, we must affirm the legitimacy of the Bank's institution of the OSC program, and their interpretation of the criteria. Fidelity cannot establish that the purposes of the regulation could not have been legitimate, in view of the larger statutory authority of the Bank Act. Moreover, even if Fidelity could meet this burden, it must also establish that the OSC could not have rationally been expected to advance the broad aims of the Bank Act. This is practically an impossible burden. *City of New Orleans v. Dukes,* 427 U.S. 297, 306, 96 S.Ct. 2513, 2518, 49 L.Ed.2d 511 (1976).

■ Additionally, Fidelity has not established that adoption of the OSC and its placement into the program was "state action". Even though we have previously decided here that, for the purposes of triggering review of the Bank's actions under the APA, the Bank is an "agency" of the U.S., we conclude that the establishment of the OSC terms or the Bank's decision to lend Fidelity advances under those terms was not "state action". These conclusions are entirely consistent with the main stream of case law which permits such a distinction. *See, e.g., Jackson v. Metropolitan Edison,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ("[t]he mere fact that a business is subject to [government] regulation does not be itself convert its action into that of the government for constitutional purposes. *Id.* at 350 [95 S.Ct. at 453]"); *Roberts v. Cameron-Brown Co.,*

556 F.2d 356, 358 (5th Cir.1977). *Compare Northrip v. Fed. National Mortgage Ass'n,* 527 F.2d 23 (6th Cir.1975) (holding that foreclosure on mortgage not "state action", and thus could not trigger due process clause scrutiny). If Fidelity cannot establish state action, it may not mount a substantive or procedural due process clause challenge.

By sheer intuition, this Court senses that certain regulatory functions performed by the Bank are inherently governmental, just by the mere fact of those tasks' delegation from the Board, which is also clearly a governmental arm; likewise, the lending, ministerial, and corporate functions of the Bank are so private enterprise-like that to call them "state action" would dilute that concept beyond recognition. The Bank's actions in making the OSC advances available to Fidelity were neither so inherently coercive, nor within traditional government functions, so as to make a finding that the Bank's programs are beyond substantive due process/equal protection scrutiny unjust.

## (B) PROCEDURAL DUE PROCESS: NOTICE AND HEARING:

The Bank makes two arguments which destroy Fidelity's contention that it was entitled to a hearing and the right to notice prior to placement into this OSC program. The first argument is quite simple, yet dispositive: Fidelity had no protectible property interest in receiving funds under the regular credit terms of the Bank's lending programs. The Bank had plenary discretion to exercise its lending capacity, consistent with its responsibility to all its member associations and its obligations under the Bank Act to the Board to deny advances to any institution that it felt could not be made safely. Under § 9 of the Bank Act, in pertinent part,

> (a)ny member or nonmember borrower ... shall be entitled to apply in writing for advances. (...) Such Federal Home Loan Bank may at its discretion deny any such application, or subject to the approval of the board, may grant it on

such conditions as the ... Bank may prescribe.

12 U.S.C. § 1429 (or referred to as "§ 9" of the Bank Act).

Fidelity's *reductio ad absurdium* argument is that § 9 permitted the Bank to either reject an application totally, or approve an application, by application of the same, draconian lending terms to all applicants, regardless of their creditworthiness. This reading of § 9, even in light of Fidelity's attempt to harmonize § 7 of the Bank Act, is implausible. In § 7, the Bank's Board of Directors is charged with the fair and nondiscriminatory application of its lending powers to make

> such advances as may be made safely and reasonably with due regard for the claims and demands of other institutions, and with due regard to the maintenance of adequate credit standing for the ... Bank and its obligations.

12 U.S.C. § 1427(j), in pertinent part. Fidelity would have this Court read § 7(j) in isolation, as barring the creation of different lending terms to suit different creditworthiness of borrowers. Not only would this totally eviscerate § 9, but would read much of § 7(j) out of the statute. Under its reading, Fidelity contends that the Bank could have legally denied them any advances under its lending policies, but could not legally, and with an eye to its statutory obligations, establish more stringent terms for weaker, and riskier, loans.

A fairer reading of the Bank Act, particularly §§ 7(j) and 9 *in toto*, compels the conclusion that the Bank had discretion to establish variable credit terms, subject to its statutory obligations. As we conclude later, the Board's motives in placing Fidelity into the program may not have been a fair application of these guidelines, in light of certain broader corporate law relationships between the two, opening the Bank up to potential liability under independent or collateral legal doctrines not preempted by the Bank Act, but the effect of §§ 7(j) and 9 is to confer plenary discretion upon the Bank to establish and implement its lending policies.

This Court could only find a "property interest" in a situation where a governmental or quasi-governmental entity establishes certain "objective and defined criteria" by which it promises that otherwise unfettered subjectivity or plenary discretion will be completely relinquished. These guidelines then ensure an automatic right to receive the benefits, once the recipient establishes his eligibility by their terms. As currently before the Court, the OSC confers broad discretion to the Bank to draft and implement disparate credit terms premised upon its interpretation of the borrower's creditworthiness. Such discretion is incompatible with a finding that Fidelity has been conferred a protected property interest. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); *Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir.), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). *C.f., Leis v. Flynt*, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979).

Second, Fidelity argues that its procedural due process rights were abridged because the timing of the hearing it ultimately received was inherently inadequate to avert the fatal blow to Fidelity as a result of being placed into the program. The resolution of this issue is far more troublesome than our concluding that Fidelity had no property interest in the advances.

The Bank argues that, even if Fidelity were to have been entitled to a hearing, it may not blame any of its losses to the denial of a pre-OSC hearing, since when ultimately granted a hearing, the Board of Directors confirmed its decision. Strung as so many beads on a string, this hastily reconstructed explanation may be logical, but provides little help in assessing the Bank's hand in sealing Fidelity's doom. To maintain, as the Bank suggests here, that if Fidelity cannot prove that by its denial of an earlier hearing, the Bank was the proximate cause of its damages, is of little value to its motion to dismiss. It also impliedly assumes that the Board's ultimate review was fair and adequate, as well as that a later hearing was unobjectionably equivalent to an earlier one.[12] However, the lynchpin of this analysis is that Fidelity had a "property" entitlement to its participation in the Bank's lending program, at a set and nonvariable rate. This Court cannot go this far.

Fidelity did not have a property right in receiving the advances upon the regular terms from the Bank, and cannot pursue a Fifth Amendment due process claim against the Bank.[13]

### Fiduciary Duties

Fidelity asserts that, under federal common law, which may properly fill in the gaps left in the federal statutes regulating the entities involved in the savings and loan industry, the Bank owed it, as well as the other minority shareholders, various fiduciary duties commonly expressed in corporate law; *viz.*, to use their corporate powers in a fair, just and equitable manner, in all their dealings. These include a lender/borrower relationship; Fidelity alleges that the Bank's instigation of the OSC program was with the intent to accelerate the defendant's crumbling fortunes. There is a technical problem with Fidelity's not naming the board of directors individually as co-defendants; however, we deem the Bank itself accountable for any breach of its directors' duties.[14]

The Bank argues that this Court should not imply any fiduciary duties between itself and the plaintiff, contending that the

---

12. There is a troubling gap which the Bank ignores: couldn't Fidelity have appealed the Bank's adverse decision to the Board, arguing all these statutory contentions, in a timely manner to give it a chance for meaningful relief, with the opportunity for Fidelity to seek judicial review under the APA, if it had a pre-OSC hearing? This question is subsumed under the APA "agency" discussion.

13. This is supported by dicta in *Fahey*, which expresses the view that the member associations have no constitutional rights to notice, hearing or formal findings of the Board. *Id.* at 427.

14. See discussion at pps. 900–901, *infra*.

Bank Act, particularly §§ 7(j) and 9, completely defines and—by citation of a litany of dissimilar case law involving statutes, the defendant maintains—preempts common law embellishment of the Bank's requisite duties to the member associations. If federal statutory law is construed to consume the field, courts are not permitted to impute common law into the "interstices" that the Court might find open to such allegations.

■ Even if Fidelity is not afforded a private right of action to challenge the Bank's actions under §§ 7(j) and 9 of the Bank Act, it may still maintain a common law tort and corporate law action for damages suffered from the Bank's breach of its duties of fair dealing and care. Taking the Bank at its word, we agree that it was Congress's intent to establish the Bank as a public corporation. By adopting the corporate model, Congress employed a shorthand signal that although the Bank was to perform certain public functions, this hybrid association was charged with all the duties, rights and obligations of corporations not inconsistent with its agency roles.

Fidelity must establish to the satisfaction of a jury reviewing the evidence of the OSC's adoption, as well as the ongoing negotiations between Fidelity and the Bank regarding its placement into that punitive category, that (1) its adoption was both not in furtherance of its regulatory functions under §§ 7(j) and 9; (2) its placement into the OSC a breach of its responsibility to Fidelity as a member association and minority shareholder; and (3) the amount of its damages which proximately resulted.

The Bank argues that the Act preempts common law corporate duties running between itself and the member associations. We conclude, from close examination of the statutory language, as well as careful consideration of the effect of permitting common law corporate fiduciary duties of fairness, care and loyalty to fill in its interstices, that the Bank Act doesn't preempt this question of the manner in which the regional banks and their directors are obliged to treat member associations. In fact, we feel that to conclude otherwise would render the Act, as now drafted, largely unworkable.

The language of the Bank Act is very specific in spots, very general in others. The structure and hierarchy of FSLIC, the Board, and the regional banks is quite detailed; the manner in which the regional banks are to operate is left to the agencies' rulemaking.[15]

Despite the Bank's argument, the Bank Act does not even remotely resemble the Federal Water Pollution Control Act, the statute involved in the *Milwaukee I and II* cases, *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), and the *Outboard Marine Corp.* case, *Outboard Marine Corp. v. Illinois*, 453 U.S. 917, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1981).[16]

■ The Bank argues, and we basically agree, that there are two instances where federal courts are permitted to fashion or apply an existing body of federal

**15.** Interaction between the member associations and these agencies is left largely to interpolation of the thrust and parry of the business world; details which congress wisely felt better determined by the exigencies of the marketplace.

**16.** That statute is a paradigmatic instance of where a common law overlay would be inappropriate for two reasons. First, the language of the statute imparts operationally complete guidelines by which all parties can guide their actions and quickly determine compliance with its directives. Second, the form of the statute imparts an impression that it was intended to supplant the vagueness or variances found in

the common law on the subject. *Milwaukee II*, 451 U.S. 304, at 314, 101 S.Ct. 1784 at 1791, 68 L.Ed.2d 114 (1981). *C.f., e.g., Grassley v. Legal Services Corp.*, 535 F.Supp. 818, 827 (S.D.Iowa 1982) (no private right of action implied under the Legal Service Corp. Act, nor any room for federal common law of libel; *U.S. v. Waste Indust.*, 556 F.Supp. 1301 (E.D.N.C.1982) (preemption clear from congressional intent to let expert agency sort out appropriate levels); *Van Orman v. American Ins. Co.*, 680 F.2d 301, 311–312 (3d Cir.1982) (ERISA an "extensive regulatory network" and Congress has "expressly announced its intention to occupy the field.

common law [17]. The first is where congressional intent has either explicitly or implicitly been to leave the federal courts with the power to develop substantive law. The second is where a "federal rule" is necessary not only to a fair and consistent decision in the case at bar, but also when it would promote or protect uniquely federal interests in a manner that a state court applying a territorially based law could not. The Bank asserts that this case satisfies neither; we conclude, from our analysis of the Bank Act supra, and our review of the helpful, but not binding, cases that this instance satisfies both.

Fidelity relies heavily upon *Barany v. Buller*, 670 F.2d 726 (7th Cir.1982), where the Seventh Circuit reversed the district court's finding that if no private right of action on behalf of deposed federal credit union board members could be implied, then they automatically had no remedy at common law. *Barany* reiterates the strictness of the post-*Cort* authority on implied private rights of action, but is quite persuasive on concluding that there are strong and "uniquely federal interests" promoted by the district courts' application of a federal common law to address the issues presented by human foibles in a federally regulated industry.

■ In assessing the appropriate application of common law fiduciary duties to judge whether the Bank directors individually, and as a body, discharged their responsibilities to Fidelity, we find little or no embellishment from the language of the Act. By this omission, we do not believe that congressional intent was to absolve the Bank's directors, then and always, of contemporary standards of conduct and mores of the marketplace. On the contrary, we can find intent to permit the Bank flexibility and operational autonomy, by permitting it much room to respond to

its members' needs; by adopting a tried and true form of operation—a corporate model—and by avoiding drafting guidelines into the legislation. *See Milwaukee II*, 451 U.S. at 314, 320, 101 S.Ct. at 1791, 1794.

Here, requiring that the directors of the Bank adhere to a level of fiduciary responsibility demanded of their private or charitable corporate counterparts would be "necessary to fill in intersticially" and "effectuate the statutory pattern enacted" in large part by Congress. *Van Orman, supra* at 312. Although similarly left to judicial interpretation, the Bank, the Board, and stakeholders seek to hold the officers of member associations to common law fiduciary duties determined in the federal courts. *Rettig v. Arlington Heights S & L*, 405 F.Supp. 819 (N.D.Ill.1975).

■ The many suits instigated by the Board, as the statutorily defined litigating arm of the government's interests, bear silent testimony to the hypocrisy of the Bank's argument that the Bank Act codifies all the duties and obligations of the entities within its purview.[18] *See Reich v. Webb*, 336 F.2d 153 (9th Cir.1964). If the Bank through its proxy, the Board, may brandish the stick of federal common law at the member association, even if fashioned under the Home Owners' Loan Act, 12 U.S.C. §§ 1461 *et seq.*, rather than the Bank Act, so may its members. We find that the underlying rationale of the HOLA requires that the other statutes be read in harmony with it. *See Bev. Hills Fed. S & L Ass'n v. Fed. Home Loan Bank Board*, 371 F.Supp. 306, 312–314 (C.D.Cal.1973).

The Bank argues that, even were it to be deemed a fiduciary, Fidelity's claim must fail for three reasons. We have considered each: (1) that Fidelity cannot identify any "res" segregated in the Bank's coiffers, which represents the sum Fidelity paid as

---

17. Federal common law is usually just a collection of the "best" state rules or a consensus, typically found in scholarly treatises or restatements, which is applied to law suits between diverse parties or involving a federal question.

18. The Court is familiar with the Board's frequent and, of late, extensive recourse to suit against members' officers and directors in furtherance of their statutory responsibilities, premised upon federal and state common law. *See, e.g., FSLIC v. Ticktin*, No. C 83–2993 *et seq.*, filed in N.D.Ill., E.D., ____ 1983.

the OSC surcharge; (2) that, since the OSC was paid voluntarily under an express contract between plaintiff and defendant, no claim for unjust enrichment may now be maintained; and, (3) that a breach of fiduciary duties, if any, was committed by the individual directors of the Bank, rather than the Bank itself. We discuss each briefly.

The "res" and "voluntary contract" arguments are so weak as to merit only the briefest attention in this order. It is this Court's understanding of the law that a tortfeasor should not be permitted to profit from his continuing misdeeds simply by commingling the overcharges with regular, clearly proper, interest charges. The "contract" argument is infirm in view of the overriding fiduciary obligations which link the Bank and its member associations; the trust and reliance that defendants owe their member associations create additional burdens beyond mere contractual duties. There is the additional layer, not found in arms' length negotiations, of the corporate law duties of loyalty, care and fairness, owed the member associations.

Plaintiff obviously seeks restitution and damages traced to the extraction of any wrongful charges by defendant. Although defendant's technical objection that the directors, not the Bank, owed any fiduciary duties that may have existed, is correct, it does not release the Bank qua Bank from its liability, if any. Clearly, any acts taken by the directors individually, and as a body, were taken in their official capacity and pursuant to their duties to the Board. Any monetary benefit to the rest of the member associations from the OSC program, or to the housing industry as a whole, inured to the system that plaintiff questions here. We can see no reason not to permit the Board to stand accountable for the actions of its highest level agents—its directors— under the doctrine of *respondeat superior.*

Plaintiff here is left with two much smaller avenues for recovery after this motion to dismiss. It may choose to pursue an APA claim for injunctive or declaratory relief, which it has had since the institution of the OSC program; we will not permit monetary recovery of the OSC charges under the APA however. It may also maintain a federal suit for breach of fiduciary obligations owed it as a shareholding member of the Bank of San Francisco; under this theory, monetary damages are recoverable. If the Bank is correct in arguing that Fidelity could have sought alternative financing, and Fidelity did not, then the potential recovery would be diminished accordingly for its failure to mitigate its damages.

IT IS SO ORDERED.