STUDENT GOVERNMENT ASSOCIATION OF WILBERFORCE UNIVERSITY, et al., Plaintiffs,

v.

WILBERFORCE UNIVERSITY, et al., Defendants.

No. C-3-83-229.

United States District Court, S.D. Ohio, W.D.

Dec. 28, 1983.

Janice I. Beers, Brookville, Ohio, for plaintiffs.

David L. Hall, Dayton, Ohio, for defendants.

## DECISION AND ENTRY DISMISSING PLAINTIFFS' FEDERAL CLAIM FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND DISMISSING WITHOUT PREJUDICE PLAINTIFFS' PENDENT STATE LAW CLAIMS; TERMINATION ENTRY

RICE, District Judge.

## I. INTRODUCTION

### A. The Parties

Plaintiffs in this matter are the Student Government Association of Wilberforce University and certain named students attending Wilberforce.[1] The individually named Plaintiffs, according to the pleadings and affidavits submitted in this action, work on the University's campus at jobs funded through the College Work Study Program (CWS). The Student Government Association purports to be representing the interests of other students, not individually named, who attend Wilberforce, are members of the Association and are also working at CWS jobs.

Defendants include Wilberforce University (the "University"), which is, according to the pleadings, a private university located in Wilberforce, Ohio. The following named administrators at Wilberforce University are also Defendants: Charles C. Taylor, President; Carl R. Smith, Vice President for Administrative and Financial Affairs; Donald L. Hutchins, Vice President of Admissions and Financial Aid; Yvonne Walker Taylor, Provost; Susan Brooks, Controller.

### B. The College Work Study Program

The pleadings and affidavits submitted in this matter reveal that the present controversy between the students and the University revolves around the manner in which the University administers certain aspects of its College Work Study Program. The CWS Program is a federally assisted program wherein funds are made available to qualifying universities and colleges to enable these institutions to create employment opportunities for students, "particularly students who are in need of earnings from employment to pursue courses of study at eligible institutions." 42 U.S.C. § 2751(a).

Participation by a school in the College Work Study Program is voluntary. Once a decision to accept federal assistance is made, however, and the school is found

---

1. The individually named Plaintiffs are: Berto Nyofu Elmore, Susan Renee Hubbard, Richard Allen Williams, Glenn A. Groover, Loren Caples, Maria Mundy, Dawn M. Hawkins, Nolan Nichols, Dale Quinton Anderson, Carl Leon Allen, Pamela J. Malone, Merlin H. Taylor, Cynthia D. Dodd, Christopher B. Young, Kimberly Patrice Morrison, and Judy Maronica Davis.

eligible according to the statutory provisions, the receipt of federal funds is conditioned upon compliance with the various statutory and regulatory provisions governing the program. *See,* 42 U.S.C. §§ 2751–2756b; 20 U.S.C. §§ 1088–1098; 34 C.F.R. §§ 668.3, 668.4, 668.8–668.85; 34 C.F.R. §§ 675.1–675.41. The cited provisions describe the congressional purpose in creating the program (42 U.S.C. § 2751), appropriate funds to the program (*id.*), define administrative requirements participating schools must agree to abide by (42 U.S.C. § 2752, 20 U.S.C. § 1094), provide guidelines on how students are to be selected for participation in the program (20 U.S.C. § 1089), authorize the Secretary of Education to oversee and regulate the program, and provide an administrative procedure through which the Department of Education may investigate and seek enforcement of the various CWS statutory and regulatory provisions (20 U.S.C. § 1094; 34 C.F.R. 668.67, 34 C.F.R. 668.71–.85).

An institution participating in the College Work Study Program must enter an agreement with the Secretary of the Department of Education whereunder the institution agrees, *inter alia,* that in selecting students for employment under the College Work Study Program, "only students who demonstrate financial need in accordance with the provisions of Section 1089 of Title 20, ... will be assisted". 42 U.S.C. § 2753(b)(3). The need analysis detailed in 20 U.S.C. § 1089 and the associated regulations (34 C.F.R. §§ 675.11–675.13) provide a formula for determining the financial need of the student, or prospective student, which takes into consideration the various sources of income available to the student ("Expected Family Contribution", 34 C.F.R. 675.12) and "cost of attendance" at the institution (34 C.F.R. 675.11). "Cost of attendance" is defined as including "(1) tuition and fees normally assessed a full time student ..., (2) an allowance for books, supplies, transportation and miscellaneous personal expenses; (3) an allowance for room and board costs". 20 U.S.C. § 1089(d)(1)–(3).

The statutorily prescribed terms of the agreement between the Secretary of Education and the institution also provide that employment under the College Work Study Program cannot be terminated during the course of the semester or regular enrollment period unless the student's income from any employment, whether funded through the program or not, exceeds by $200 or more the amount assessed as the student's "need" under 20 U.S.C. § 1089. 42 U.S.C. § 2753(b)(4). In addition, federal regulations promulgated pursuant to the College Work Study statute provide that in paying the student under the program the "institution may not directly transfer the federal share of any payment to the student's account at the institution or elsewhere to pay expenses or bills." 34 C.F.R. § 675.16. Rather, the instrument issued to the student must be capable of negotiation with the student's own signature. *Id.*

## C. The Substance of the Dispute

The Plaintiff-students allege that the University has deviated from the terms of the agreement entered with the Secretary of Education and that the overall impact of these deviations serves to frustrate the congressional purpose of the CWS Program and to create a situation wherein the students are in danger of suffering immediate and irreparable damages. The students appear in part to be taking issue with the University's determination of the "need" level of the CWS students.

The Plaintiffs feel that the University tends to understate the students' need levels so that students are unable to earn enough from the CWS jobs to cover their necessary expenses for travel and personal needs, and in some cases, are unable to earn sufficient money to buy books.

The students also claim that the University prematurely terminates their income from their CWS jobs. According to the Plaintiffs, at the beginning of the semester, the University establishes for CWS students a deferred account equal in amount to the various costs associated with attendance for the term. Once a student has

earned enough to pay off the balance of this account, compensation for their CWS job ceases.

This action, Plaintiffs argue, is in direct violation of 42 U.S.C. § 2754(a)(4), which prohibits termination of the student's CWS job during the semester or regular enrollment period unless or until the student has earned $200 or more in excess of the University's prior assessment of his or her need.

Plaintiffs further take issue with the method of payment allegedly employed by the University to compensate the CWS students. The students claim that they have received checks unsigned by the appropriate University official, which are, therefore, instruments not capable of negotiation even if endorsed by the student. Allegedly, the students have been required to endorse these unsigned checks and return them immediately to the University official. Plaintiffs contend that this procedure amounts to an assignment to the University of their entire income from their CWS job to pay the deferred expenses of attendance. Plaintiffs assert that this method of payment to the students contravenes the regulations prohibiting direct transfer of CWS funds to pay institution expenses and bills as well as the requirement that the students be paid with instruments "capable of negotiation." 34 C.F.R. § 675.16.

### D. The Students and the Administration Clash

Feeling that the CWS Program was being administered unjustly, the CWS students, according to the pleadings, undertook a protest at the University by refusing to endorse the unsigned and therefore, nonnegotiable instruments they received from the University. In response to this protest, the University issued a notice that students who failed to recommence endorsing their work study checks would have the entire amount due on their deferred accounts accelerated. (Plaintiffs' Complaint, attachment C, March 4, 1983, letter from Dr. Charles Taylor, President.) If a student failed to pay the accelerated balance due, the student would be dismissed and denied credit for that trimester, and would not be readmitted until the balance was paid in full.

Subsequent to this notice, some students endorsed their checks; some endorsed their checks along with added notations to the effect that they had endorsed under protest and duress. On March 4, 1983, the University discontinued its practice of issuing unsigned checks to the CWS students and instead issued checks bearing the signature of the appropriate University official. With these checks, however, was a notice informing the students that the University would not accept CWS checks with restrictive endorsements and that the failure of any CWS student to pay on his or her account on a biweekly basis would result in the entire balance being accelerated and due and payable immediately. (Plaintiffs' Complaint, attachment C.)

On March 14, 1983, after announcement of the University's policy and after some of the CWS students had received notices that they were to pay the entire deferred balance on their accounts or face dismissal without credit, the Plaintiff-students and Student Government Association filed the Complaint in this proceeding along with a Motion for Temporary Restraining Order and Preliminary Injunction to Preserve Evidence with Accompanying Affidavits. The motion was filed to seek Court enforcement of the status quo by restraining the University from destroying evidence, (i.e., checks in the possession of the University which lacked the payee's signature), and to prevent students from being dismissed from the school before the propriety of the University's actions could be determined. Plaintiffs in the Complaint are ultimately seeking to have the Court issue a declaratory judgment and to order injunctive relief that would, in effect, force the University to comply with what Plaintiffs perceive as the administrative requirements and limitations of the CWS Program.

In response to Plaintiffs' motion, Defendants filed a Motion for Summary Judgment wherein the Defendants contended, *inter*

*alia,* that the Court lacks subject matter jurisdiction to hear the instant dispute. At a conference scheduled by the Court to discuss Plaintiffs' and Defendants' respective motions, the parties agreed to enter a "status quo agreement" wherein the students agreed to continue their College Work Study jobs, to make their biweekly payments on their deferred accounts and to endorse their checks without adding restrictive endorsements. The University agreed not to accelerate student accounts or to cancel registrations or order students off campus "as long as students are in substantial compliance" with the terms to which they agreed. (*See* attachment to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, doc. # 10.)

On April 12, 1983, Plaintiffs returned to Court with a second motion for Temporary Restraining Order and Preliminary Injunction and with an Amended Complaint. In their Memorandum in support of their Motion (Doc. # 12), Plaintiffs claim that the status quo agreement, rather than preserving the status quo among the parties, has been adopted by the University as a "new policy statement" wherein biweekly payment in each student's deferred account has been rigidly required, thus resulting in more students having their accounts accelerated and being threatened with dismissal absent payment in full of their deferred accounts. The temporary restraining order presently sought is deemed necessary to protect the individual Plaintiffs and those represented by the Student Government Association from the consequences of having their deferred accounts accelerated, being unable to pay the balance, and losing their credits for the trimester.

Also, by way of Amended Complaint, Plaintiffs have added claims for relief founded on Ohio tort and contract law. These tort and contract claims primarily focus on the University's conduct subsequent to the time the students began their protests concerning the administration of the College Work Study Program. In particular, the students allege that the requirement for biweekly payments as well as the threat of expulsion for failure to make the payments, constitute violations of their Student CWS Employment contracts that they entered into with the University. The students contend that the actions of the University are arbitrary and capricious and have no foundation in the existing contracts and therefore amount to a unilateral amendment of same. They also claim that the actions of the University in accelerating the deferred accounts and expelling students are malicious and unreasonable. (Plaintiffs' Amended Complaint, ¶¶ 49–64.) Plaintiffs contend that the same series of administrative infractions complained of in the original complaint form the basis of their tort and contract claims. Therefore, they urge the Court to exercise its pendent jurisdiction over these related state claims pursuant to *United States Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In addition to seeking the injunctive and declaratory relief prayed for in their original complaint, Plaintiffs in their Amended Complaint also seek a form of redress for those students who Plaintiffs feel have been wrongfully expelled from the University because of the University's alleged tortious mishandling of the College Work Study program and its unilateral amendment of the CWS student contracts. In particular, the Amended Complaint seeks a Court order that would require Defendants to provide a free trimester of education to these students for every trimester they were wrongfully denied credit, or, in the alternative, to provide the equivalent of such education at a school of the students' choice.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have alleged that the Court has jurisdiction to hear this controversy pursuant to 28 U.S.C. § 1331 which provides in pertinent part that "the district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." It is Plaintiffs' contention that their action arises under the federal stat-

utes creating the College Work Study Program, 42 U.S.C. §§ 2751–2756b, and the official regulations promulgated pursuant to the College Work Study provisions.

■ The Defendants have moved for summary judgment pursuant to Fed.R. Civ.P. 56(b). Defendants have asserted a number of grounds which they feel entitle them to summary judgment. Of preliminary concern is Defendants' contention that the College Work Study statutory provisions and the associated regulations do not confer on the students a private right of action and thus the suit is not, despite Plaintiffs' allegation, a "civil action arising under the laws of the United States". Defendants have asserted that the absence of a private right of action under the CWS statutes deprives the Court of subject matter jurisdiction over this dispute which, they further contend, entitles them to a grant of summary judgment in their favor pursuant to Fed.R.Civ.P. 56(b). In fact, the presence or absence of a private right of action in most instances does not go to the question of whether the court has subject matter jurisdiction, but rather calls for a judgment on the merits of a plaintiff's claim. *Burks v. Lasker,* 441 U.S. 471, 476 n. 5, 99 S.Ct. 1831, 1836 n. 5, 60 L.Ed.2d 404 (1979); *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945); *Williamson v. Tucker,* 645 F.2d 404, 415–416, (5th Cir.1981), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

> Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.

*Williamson v. Tucker,* 645 F.2d at 415.

■ The present matter would appear to be a lawsuit arising under the laws of the United States, i.e., 42 U.S.C. § 2751, *et seq.*

As the Court does not find Plaintiffs' federal claim to be immaterial nor insubstantial or frivolous, the Court concludes that it has subject matter jurisdiction to determine the merits of Plaintiffs' claim. Thus, whether the Court treats this attack on Plaintiffs' claim as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted or a Rule 56 motion for summary judgment, a determination that no federal claim exists, in this instance, results in a judgment on the merits. *Id.* In the instant case, Defendants appear to be arguing that whatever may be the true set of facts which led to the filing of this suit, the controversy does not present a triable issue because the CWS statutes do not confer a private right of action on Plaintiffs to enforce its provisions. Because the Court need not determine whether there are genuine issues of material fact to resolve the question of whether a private right of action exists under the CWS statutes, the Court will consider Defendants' motion as a Rule 12(b)(6) motion to dismiss for failure to state a claim, rather than as a Rule 56 motion for summary judgment.

In addition, Defendants claim that, should the Court find a private right of action does exist under the CWS statutes, then Defendants are also entitled to summary judgment on the following grounds: the students have no standing to sue because only one of them was in danger of being expelled from school; the Student Government Association does not have standing to sue because, though some of its members may be participating in the College Work Study program, the Association itself does not have a direct and present interest that may be affected by the administration of the program; the Court should not hear the present matter because, in objecting to the University's administration of the College Work Study Program, Plaintiffs have failed to exhaust their administrative remedies available to them both on campus and through the Department of Education; and the Court should not exercise its pendent jurisdiction

over the state tort and contract claims raised by the Plaintiffs in their Amended Complaint because of the potential for confusion, arising from the fact that the contract and tort disputes alleged by Plaintiffs do not relate to the claimed infractions in the administration of the Work Study Program that form the basis of Plaintiffs' Complaint.

Because the Court concludes that the CWS statutes do not confer on Plaintiffs a private right of action to enforce University compliance with the CWS program directives and requirements, the Court does not find it necessary to address the remaining grounds for summary judgment asserted by Defendants, beyond, of course, determining that the Court will not exercise its pendent jurisdiction over the raised state law tort and contract claims.

### III. PRIVATE RIGHT OF ACTION

Whether Plaintiffs have alleged a claim entitling them to any form of relief hinges upon the determination of whether the College Work Study statutes confer a private right of action on students participating in CWS programs to enforce a school's compliance with the controlling statutory and regulatory provisions. As the CWS statutory provisions do not expressly confer such a right of action on students employed under the program, the question becomes whether a private right of action may be implied.

The factors appropriate to analyze in determining whether a federal statutory scheme creates a private right of action in the plaintiffs before the Court were articulated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Under this analysis, the Court makes the following inquiries:

(1) [I]s the Plaintiff 'one of the class for whose *especial* benefit the statute was enacted'?

(2) [I]s there any indication of a legislative intent explicit or implicit either to create a remedy or to deny one?

(3) [I]s it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the Plaintiffs?

(4) [I]s the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2087 (emphasis in original).

In recent years, the Supreme Court has clarified how these standards are to be applied. In *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court stressed "[W]hile some opinions of the court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purpose of a given statute, what must ultimately be determined is whether Congress intended to create the private remedies asserted .... " *Id.* at 15–16, 100 S.Ct. at 245 (citations omitted). Similarly, the Court in *Touche-Ross v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), in commenting on the four *Cort v. Ash* inquiries explained, "The court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication the private cause of action." *Touche-Ross v. Redington,* 442 U.S. at 575, 99 S.Ct. at 2488. *See also, California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Universities Research Assn. v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981).

Thus the Court may not find that a private right of action exists simply because permitting private enforcement of a particular statute would be not inconsistent with, or might in fact advance, the purpose of the legislative scheme under consideration. *Touche-Ross v. Redington,* 442 U.S. at 575, 99 S.Ct. at 2488; *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 11–12, 100 S.Ct. at 242. Rather, the analysis to be applied in determining the existence or non-

existence of an implied private right of action is a more focused and demanding inquiry.

■ In application, the first two inquiries, whether the statute benefits a particular class and whether Congress intended the statutory provision to be enforced by means of a private right of action, are very much intertwined. The clearer and more particularized the benefit conferred on a class by a statute the more likely it becomes that Congress, even though not explicitly so providing, intended the benefited class to have a means by which they could protect that right so conferred. Thus it is insufficient in the private right of action analysis that a statute may in some general or tangential way serve to benefit a class. Instead the statute must confer a federal right directly on the class of which the plaintiff is a member. *Universities Research Association v. Coutu*, 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981); *California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). There must, in other words, be "an unmistakable focus on the benefited class" before a private remedy will be found. 450 U.S. at 772, 101 S.Ct. at 1462; 451 U.S. at 294, 101 S.Ct. at 1779.

"Where the statutory language does not by its terms proscribe specified conduct or create or alter civil rights or liabilities, such language cannot support implication of a private right of action." *Osborn v. American Association of Retired Persons*, 660 F.2d 740, 744 (9th Cir.1981). Moreover, to the extent the language in question does not directly confer rights on a class, but rather is "phrased as a directive to federal agencies engaged in the disbursement of public funds," (*Cannon v. University of Chicago*, 441 U.S. 677 at 693, n. 14, 99 S.Ct. 1946, 1955 n. 14, 60 L.Ed.2d 560) the Supreme Court has consistently declined to find a private right of action, notwithstanding the fact that the particular directive may serve to benefit the class in question. *Coutu*, 450 U.S. at 774, 101 S.Ct. at 1463; *Pennhurst State School v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

With this analytical framework in mind, the Court turns to the preliminary inquiries of whether the CWS statutes confer the requisite federal right on the Plaintiff-students and correspondingly, whether the legislative history, the entire legislative scheme and/or the nature and extent of any benefit flowing to the students supports a conclusion that Congress intended that students would have a private right of action to enforce University compliance with the CWS program directives.

The statutory section that announces the congressional purpose in implementing the CWS Program provides:

(a) The purpose of this part is to stimulate and promote the part-time employment of students, particularly students who are in need of earnings from employment to pursue courses of study at eligible institutions.

42 U.S.C. 2751.

Arguably, this language evinces a congressional intent to provide a benefit to students who need a source of income in order to afford the expenses of post secondary education.

The legislative history of the College Work Study Program underscores the intent apparent in the statutory language. The CWS Program was originally a part of the Equal Opportunity Act of 1964 and the "War on Poverty" during the Johnson administration. As explained in the legislative history, the Youth Programs, which included the College Work Study Program, "concentrate on problems of youth and especially on the problem of youth trying to get the skills with which he can find a decent job." 1964 U.S.Code Cong. and Admin.News 2900, 2902. The same legislative history stresses congressional concern over the growing number of out-of-school and unemployed young people from economically disadvantaged families. *Id.* The College Work Study Program has since been transferred to the Higher Education Act of 1965 which has as its "fundamental theme ... a goal of equal educational opportuni-

ty." H.R. No. 96–520, 96 Cong.2d Sess., *reprinted in,* 1980 U.S.Code Cong. and Admin.News 3141, 3144.

One could not seriously dispute that students, such as those presently before the Court, who depend upon the income from their CWS jobs to pursue their college education, are within the class of individuals whose interest Congress sought to advance in funding this employment program. But the desire to advance the interests of a class of individuals does not necessarily amount to the conferring of a federal right on that same class. Clearly, all students or potential students who need employment to pay the expenses of post secondary education cannot be viewed as having become vested with certain federal rights by virtue of the passage of the CWS statutes. The statutes may provide a resource available to some institutions and to some individuals attending those institutions, but a student or potential student has no guaranteed entitlement to a CWS job, however needy he or she may be.

It could be argued, and Plaintiffs have very persuasively so argued, that the CWS statutes confer certain limited federal rights on students employed at CWS jobs by means of certain provisions in the statutes which were clearly intended to limit the discretion of participating institutions to the benefit of the CWS students. For example, 42 U.S.C. § 2753(b)(1)(A) provides that the institution must agree not to "pay any wage to students employed under this subpart that is less than the current Federal minimum wage...." Also, 42 U.S.C. § 2753(b)(4) provides that no student will be terminated from a CWS job when income from the CWS job is in excess of the student's assessed need, unless or until, that excess income equals $200 or more than the assessed need level. Thus, the argument runs, the CWS statutes confer on CWS students a federal right to be paid at least the federal minimum wage and to earn from their CWS jobs up to $200 in excess of their assessed need level.

Applying the *Cort v. Ash* analysis, then, it could be argued without straining the limits of reason, that students, such as Plaintiffs, employed at CWS jobs are within the class of individuals "for whose *especial* benefit the statute was enacted", by virtue of the fact they have been selected to participate in the CWS program because of their financial need. *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087. Reaching this conclusion would satisfy the first *Cort v. Ash* factor. The second *Cort v. Ash* factor then, would require an inquiry into legislative intent to create or deny a private right of action. *Id.* Though neither the statutory language nor the legislative history of the CWS statutes address the issue of whether private enforcement of the CWS statutory directives was anticipated or felt desirable, congressional silence is not necessarily fatal to finding a private right of action. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 18, 100 S.Ct. at 246. "We must recognize ... that the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." *Cannon v. University of Chicago,* 441 U.S. at 694, 99 S.Ct. at 1956. Thus, where "it is clear that federal law has granted a class of persons certain rights, it is not necessary to show intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling." *Cort v. Ash,* 422 U.S. at 82, 95 S.Ct. at 2089 (emphasis in original).

If, then, the provisions in the CWS statute which limit institution discretion for the benefit of CWS students are viewed as creating the limited federal rights discussed above, then arguably, the provisions can likewise be viewed as conferring upon CWS students a private right of action to enforce institution compliance with these provisions to protect their federal rights. Moreover, implying a private right of action in CWS students to enforce CWS program provisions through injunctive and declaratory relief, as requested herein, not only serves to protect the students' rights under the program but also imposes no greater burden on the institution than that

which it originally agreed to undertake when it first accepted CWS funds.

Further support for finding a private right of action for injunctive relief to enforce institution compliance with CWS provisions can be garnered from drawing an analogy between the present action and actions brought by Social Security recipients to enforce state compliance with the various provisions of the Social Security Act and subsequent amendments to that Act. In permitting plaintiffs to bring actions to enforce state compliance with federal Social Security laws, the Supreme Court has recognized that the entitlement to funds intended to be vested in program participants by virtue of the Social Security laws, are "rights secured" by the laws of the United States and enforceable pursuant to 42 U.S.C. § 1983.[2] *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969). Because the Social Security controversies involve questions concerning the actions of the state, § 1983 can be relied upon to provide the requisite cause of action rather than having to rely on the Social Security laws as providing not only the federal right but also the implied private right of action. In the instant proceeding, 42 U.S.C. § 1983 is not available to the Plaintiffs as a vehicle for prosecuting the present action against the University and other Defendants because, as the pleadings reveal, the University is a private as opposed to state school and the mere receipt of federal funds is insufficient to transform the acts of this otherwise private institution into the state action upon which a § 1983 action is dependent. *Rendell-Baker v. Kohn,* 457 U.S. 830, 839–843, 102 S.Ct. 2764, 2770–72, 73 L.Ed.2d 418 (1982). Though state action is missing, nonetheless, it could be argued that the federal interest in having federal funds expended according to congressionally mandated statutory requirements is no less simply because the institution involved is a private actor as opposed to the state. Assuming that Plaintiffs' allegations are true and that the University has in fact violated the statutory requirements of the CWS program, then here, as in *Rosado,* "federal funds are being allocated and paid in a manner contrary to that intended by Congress." *Rosado, supra,* at 421, 90 S.Ct. at 1222. Based upon this reasoning, as far as it goes, it does not appear patently unreasonable to infer that Congress intended the CWS students to be able to insure that the CWS program be administered by participating institutions in conformity with the applicable statutes and regulations so as not to deprive the students of the benefits Congress intended to confer upon them.

This analysis, however, breaks down upon closer scrutiny. Arguably, if the Court narrows its focus to the class of students actually employed at CWS jobs, a fairly strong case can be made that the various program directives and restrictions placed on an institution's administration of CWS funds are intended to run to the benefit of the CWS students. That these students have been identified by their respective institutions as in need of financial assistance if they are to obtain post-secondary education leads to the inescapable conclusion that these are in fact the very individuals "for whose *especial* benefit the statute was enacted." *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087. The problem is not, however, with the first *Cort v. Ash,* factor, which the Court finds to be satisfied to the extent Plaintiffs are students employed at CWS jobs. Rather, the reasoning discussed above becomes mired down when the Court examines the second *Cort v. Ash* factor which focuses on Congressional intent and whether Congress conferred fed-

---

**2.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

eral rights on CWS students and thus, by implication, a private right of action to protect those rights. Determining whether the program guidelines and concomitant benefits to the students were intended by Congress to give rise to the asserted private right of action, requires that the Court take a closer look at the statute, the legislative history and the true character of the proscriptions and the purported federal right or rights created.

As stated above, both the statute and the legislative history are silent on the issue of private enforcement of the CWS statutory directives. Though it is true that the Supreme Court has been willing to imply a private right of action in the face of comparable Congressional silence when "the statute confer[s] a right directly on a class of persons that include[s] the plaintiff" (*Cannon v. University of Chicago*, 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13.), the Supreme Court has declined to construe statutory language as creating a privately enforceable federal right, where Congress, "rather than drafting the legislation 'with an unmistakable focus on the benefited class,' instead has framed the statute simply as a general prohibition or command to a federal agency." *University Research Assn. v. Coutu*, 450 U.S. at 772, 101 S.Ct. at 1462, quoting *Cannon*, 441 U.S. at 691, 99 S.Ct. at 1955.

In the instant action, the legislative source of Plaintiffs' alleged federal rights is the statutory provision directing the Secretary of Education to enter into agreements with participating institutions containing certain terms specified in the statute and "such other provisions as the Secretary shall deem necessary or appropriate to carry out the purpose of this part." 42 U.S.C. § 2753. This statutory language, however, rather than focusing on the class to be benefited is instead phrased as a directive to the Secretary of Education concerning the limitations under which the CWS funds may be disbursed. As found in *Murphy v. Villanova University*, 547 F.Supp. 512, 519 (E.D.Pa.1982),

The right-creating, or duty-creating, language of section 2753(b) does not focus on the benefited class. Instead, "the duty created by the statutory language" is imposed on the Secretary "to ensure that certain provisions are included" in federal grant agreements. [*Coutu*, 450 U.S. at 772–773 n. 23, 101 S.Ct. at 1462 n. 23] The statutory language, then, "provides no support for the implication of a private remedy."

*Id.* at [773, 101 S.Ct. at 1462].

Moreover, a closer look at the ostensible federal rights discussed above (*supra*, at p. 943) causes them to pale somewhat in significance. However desirable and beneficial may be the provision of resources that enable needy students to obtain post-secondary education, the need fulfilled is not the sort of basic sustenance needs fulfilled by the various Social Security programs. Comparison of CWS participants' "rights" to what have been viewed as the statutorily created rights of Social Security program participants appears a bit strained. In addition, to the extent the CWS statutes can be deemed as conferring rights on CWS students, these rights are capable of forfeiture by the institution upon the decision of the Secretary of Education without any apparent opportunity for input from the students affected.

A review of the remainder of the statutory provisions applicable to the CWS Program reveals a provision authorizing the Secretary of Education to enforce the terms of the CWS program and to promulgate regulations necessary to insure institution compliance with program directives and guidelines. 20 U.S.C. § 1094. The statutory provision and corresponding regulations (34 C.F.R. 668.61–.67, 668.71–.85) provide, *inter alia*, a procedure whereby the Secretary may pursue informal efforts at obtaining institution compliance with the program directives (34 C.F.R. § 668.73) or, failing compliance, to commence fine, suspension or limitation or termination proceedings against the offending institution. (34 C.F.R. § 668.75, .76, .77). Noticeably lacking within this enforcement scheme is

any express procedure by which students may bring an action to enforce their CWS "rights" as such. They may file a complaint with the Department of Education, bringing University noncompliance with CWS provisions to the attention of the Agency, (See, 34 C.F.R. § 668.73(a) which assumes the Secretary of Education may receive complaints from sources external to the Department of Education) but there is no procedure whereby CWS students may become involved in the process such as is made available to individuals whose rights are protected under, for example, the Family Educational Rights and Privacy Act of 1974 which is governed by C.F.R. Part 99, or Section 504 of the Rehabilitation Act of 1973 (which concerns discrimination on the basis of handicap) which is governed by 34 C.F.R. Part 104.

Apparently, then, the Agency vested with the responsibility of implementing the CWS program did not view the CWS statutes as creating rights in students that they should be able to enforce in administrative proceedings, but rather viewed the statute more as specifying contractual terms, compliance with which was a matter between the Secretary of Education and the institution. If an offending institution fails to bring itself into compliance, the Secretary may terminate CWS funds (34 C.F.R. § 668.82). Furthermore, reinstatement into the program is a matter within the Secretary's discretion and the determinative factor in resuming funding is whether the institution has corrected its past violations not whether the rights of CWS students have been or are being adversely affected by the discontinuation of federal funds. 34 C.F.R. § 668.84(b). Nowhere do either the statutes or the regulations suggest that a student could force the Secretary to continue funding a CWS program in order to preserve the student's "right" to his CWS salary.

Moreover, faced with such a comprehensive enforcement scheme, the Court must be mindful of the Supreme Court's admonition that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into

it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Middlesex Cty. Sewerage Auth. v. Nat. Sea Clammers*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). As concluded by the court in *Murphy v. Villanova University*,

The inclusion of these enforcement provisions in the Higher Education Act strongly supports the view that when Congress added § 2753(b)(4) and (b)(7) to the CWSP provisions of the Act in 1976 —and framed them as mandates to the then Commissioner of Education in the disbursing of grants—Congress intended that these provisions would be enforced by the Commissioner through the mechanisms it was also then creating and not others. This inference finds corroboration in the fact that in 1980 Congress again turned its attention to the enforcement of the provisions governing the CWSP and again failed to provide for any private right of action but chose rather to strengthen the Secretary's enforcement artillery.

547 F.Supp. at 520 (Footnotes omitted).

Nothing in the statutory framework so much as hints that there existed any Congressional intent that recipient institutions could be hauled into federal courts by disgruntled CWS students to have the court, and not the agency vested with oversight responsibility and expertise, interpret whether the funding guidelines and various program directives are being followed.

To read the restrictions placed on institution discretion in the CWS statutes as conferring federal rights on CWS students, which Congress intended to be enforced through private actions, is simply to read too much into the language of the statute and the benefits sought to be conferred on CWS students. What emerges from reviewing the CWS statutory scheme is the picture of a voluntary grant program in which institutions may participate and which, though the funds may benefit the class of needy students or potential students, in no way creates in them or in

students actually employed in CWS jobs federal rights which can be enforced by means of an implied private right of action. Enforcement of the CWS program provisions is a matter Congress apparently felt best vested in the Secretary of Education.

As explained by the Supreme Court in *Pennhurst*, "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds...." *Pennhurst State School v. Halderman*, 451 U.S. at 28, 101 S.Ct. at 1545. Though a private institution as opposed to the state is the recipient of federal funds in the instant action, the remedy available for rectifying the alleged mishandling of federal funds appears to be the same, i.e., action by the Federal Government and not a private cause of action.

■ To imply a private right of action in the CWS students, this Court feels, would be to disregard Congressional intent and to imply a private right of action simply because in this instance, it might seem desirable, a course of action explicitly foreclosed by recent Supreme Court decisions. *See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. at 15–16, 100 S.Ct. at 245; *Touche-Ross v. Redington*, 442 U.S. at 575, 99 S.Ct. at 2488; *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101; *Universities Research Assn. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662. The Court, therefore, has no choice but to conclude that a private right of action in the Plaintiff-students cannot be implied under the statutory provisions applicable to the CWS program.[3] That being the Court's conclusion, the Court finds that Plaintiff's asserted federal cause of action must be dismissed for failure to state a claim upon which relief can be granted.

## IV. THE PENDENT CLAIMS

■ All that now remains of Plaintiffs' Amended Complaint are the alleged state law contract and tort claims lodged against the Defendants, over which Plaintiffs urge the Court to exercise its pendent jurisdiction. Though this Court has the *power* under the doctrine of pendent jurisdiction to hear state law claims if they would ordinarily be raised with a federal claim, the exercise of that power is discretionary and "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). As the Court has found it necessary to dismiss Plaintiffs' alleged federal claims, the Court also finds it most appropriate to decline to exercise its pendent jurisdiction over Plaintiffs' state law contract and tort claims. The Court, therefore, dismisses these claims without prejudice, noting that Plaintiffs are free to pursue their claims in state court should they so desire. The Court notes that as a practical matter, Plaintiffs will not be prejudiced

---

3. The Court notes that because the second *Cort v. Ash* factor is not satisfied, there is no need to proceed to analyze the remaining two factors which would require the Court to determine whether the private remedy sought would be consistent with the underlying scheme of the statute and whether the cause of action is traditionally one "relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087. Neither of these remaining two factors would have posed to Plaintiffs the serious obstacles to implying a private cause of action which was posed by the second *Cort v. Ash* factor, which requires find-

ing Congressional intent that plaintiffs have the ability to pursue the private remedy sought.

To the extent plaintiffs sought to bring the University into compliance with the CWS statutes and regulations, it would appear that such an objective would be entirely consistent with the underlying purpose of the statutory scheme. Moreover, to the extent Plaintiffs sought compliance with a federal statute, the present matter would not appear to have been one "traditionally relegated to state law." Thus, the critical element missing in Plaintiffs' formula was the one factor upon which the Supreme Court has come to place the greatest emphasis: congressional intent that the Plaintiffs have the claimed private right of action.

**948**

by the dismissal of these pendent state law claims as the state prescribed period of bringing contract and tort claims has not yet expired.[4]

## V.  CONCLUSION

Guided by the analytical framework and principles enunciated in recent Supreme Court cases, the Court finds that a private right of action in the Plaintiff-students cannot be implied under the CWS statutes, as both the statutory scheme and legislative history are devoid of any indication that Congress intended other than the Secretary of Education to oversee and to enforce institution compliance with the statutory and regulatory provision of the CWS Program.  Having concluded that the alleged federal cause of action asserted by Plaintiffs, in fact, fails to state a claim upon which relief can be granted, the Court orders dismissal of these claims and, having done so, declines to exercise its pendent jurisdiction over the related state contract and tort law claims, dismissing said claims without prejudice.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

**4.**  To the extent Plaintiffs have stated a claim for relief sounding in contract, the applicable statute of limitation is O.R.C. § 2305.06 which provides that a cause of action based upon a written contract must be brought within 15 years. To the extent Plaintiffs have stated a claim for relief sounding in tort, the applicable statute of limitation is O.R.C. § 2305.09 which requires that the cause of action be brought within four years after the cause of action accrued.  As the complained of activities have all occurred within the past year, and in fact, may still be occurring, Plaintiffs' state law claims would not appear to be time barred.